(16-2) (Part 16-2) 02.21.25 re: In re Group Management Corp., 03-93031 (BC NDGA), Chapter 11, Supplement #1 to Rule 8009(d) Appellants' and Appellees' Joint Stipulated Appellate Record.

## Case No. 03-93031(16-2) (Part 16-2)[1]

## United States Bankruptcy Court
## For the Northern District of Georgia
## (Atlanta Division)

_Filed in U.S. Bankruptcy Court
Northern District of Georgia
Vania S. Allen, Clerk
FEB 2 6 2025
By:_
_Deputy Clerk_

## In re Group Management Corp., Chapter 11
## On Appeal in In re Group Management Corp., District Court
## (NDGA) 25cv00613 (MLB)

**Submitted on Friday, February 21, 2025, 9:56:15 AM via U.S. mail and Email to: Bankruptcy Clerk Vania S. Allen and Chief Judge Barbara Ellis-Monro Pursuant to Bankr. Rules 5003(a) and 8009(d).**

Supplement F-7 (Appellants' Declaration of Actual and/or Constructive Notice of Adverse Consequence to all Appellees).

Supplement F-8 (Declaration of Appellees Baker & McKenzie, LLP and Lawrence B. Mandala, Esq. regarding the Ill-Advised Form S-2 Frivolous and Fraudulent Unlawful Debt Collection Registration Statement).

Supplement F-9 (Declaration of Elorian Landers, Group Management's former CEO).

## Bankruptcy Clerk's Filing Cover Letter

---

[1] District Court (NDGA) Docket No. 25cv00613 (MLB).

**APPELLANTS' AND APPELLEES' JOINT STIPULATED STATEMENT OF THE ISSUES PRESENTED ON APPEAL IN *IN RE GROUP MANAGEMENT CORP.*, CASE NO. 25CV00613 (NDGA) (MLB).**

**RESPECTFULLY SUBMITTED,**

**For Appellants: GROUP MANAGEMENT and Ulysses T. Ware**

/s/ Ulysses T. Ware

**Submitted by:**
**Ulysses T. Ware**
**The Office of Ulysses T. Ware**
123 Linden Blvd., Ste 9-L
Brooklyn, NY 11226
(718) 844-1260
**Utware007@gmail.com**
February 21, 2025, 9:56:15 AM

# Table of Contents

1.    **Supplement F-7—Attached hereto and made a part hereof, incorporated by reference. (Appellants' Declaration of Actual and/or Constructive Notice of Adverse Consequence to all Appellees).** ...................................................................................................................................7

2.    **Supplement F-8 (Declaration of Appellees Baker & McKenzie, LLP and Lawrence B. Mandala, Esq. regarding the Ill-Advised Form S-2 Frivolous Registration Statement).** .....................8

    **Memorandum regarding F-8** ..........................................................................................................8

    A.    **Summary of Supplement F-8 (Appellants' Perspective):** ..........................................8

    B.    **Document F-8 as Inadvertent Support for Appellants' Core Appellate Issues (F-1):** .............9

3.    **Supplement F-9 (Declaration of Group Management's former CEO Elorian Landers).** ..........12

    **Memorandum regarding F-9: Declaration of Elorian Landers, Group Management Corp.'s former CEO.** ...................................................................................................................................12

    A.    **Summary of Supplement F-9 (Appellants' Perspective):** ..........................................12

**Certificate of Service** ...............................................................................................................17

**End of document** .....................................................................................................................17

# The Office of Ulysses T. Ware

123 Linden Blvd., Ste 9-L
Brooklyn, NY 11226
(718) 844-1260
utware007@gmail.com

February 21, 2025, 9:56:15 AM

**VIA ELECTRONIC FILING AND U.S. MAIL**

Vania S. Allen
Office of the Clerk
United States Bankruptcy Court
Northern District of Georgia
Richard B. Russell Federal Building and United States Courthouse
75 Ted Turner Drive, S.W.
Atlanta, Georgia 30303

**Re: (16-2) (Part 16-2) 02.21.25 re: In re Group Management Corp., 03-93031 (BC NDGA), Chapter 11, Rule 8009(d) Appellants' and Appellees' Joint Stipulated Appellate Record – Appeal Case No. 25cv00613 (NDGA) (MLB).**

**Appellants' Supplements F-7, F-8, and F-9: Filing of Rule 8009(d) Joint Stipulated Appellate Record.**

**Dear Ms. Allen, Clerk of the Bankruptcy Court:**

    Appellants-Movants, Ulysses T. Ware and Group Management (successor in interest to the Chapter 11 Debtor, and 11 U.S.C. § 1109(b) statutory parties in interest), hereby submit for filing and docketing the attached document titled **"(16-2) (Part 16-2) 02.21.25 re: In re Group Management Corp., 03-93031 (BC NDGA), Chapter 11, Rule 8009(d) Appellants' and Appellees' Joint Stipulated Appellate Record"** (hereinafter, the "Joint Stipulated Appellate Record").

    This filing constitutes Appellants-Movants' designation of the Appellate Record on Appeal in the above-referenced matter, Case No. 03-93031 (WLH), which is currently pending appeal before the United States District Court for the Northern District of Georgia as Case No. 25cv00613 (NDGA) (MLB), Dkt. 279.

The attached Joint Stipulated Appellate Record is submitted pursuant to Rule 8009(d) of the Federal Rules of Bankruptcy Procedure, and is intended to serve as the Agreed Statement as the Record on Appeal in this matter, in lieu of the standard record designation process outlined in Rule 8009(a).

As detailed within the attached Joint Stipulated Appellate Record, and as evidenced by prior filings with this Honorable Court, Appellants-Movants have made diligent and good faith efforts to engage all Appellees-Respondents in a collaborative process to finalize a truly *joint* stipulated record pursuant to Rule 8009(d). To that end, Appellants-Movants have provided all Appellees-Respondents with actual notice of the proposed Joint Stipulated Appellate Record via electronic mail to their respective public email accounts, as documented in the Certificate of Service attached to the Joint Stipulated Appellate Record.

Pursuant to Bankruptcy Rule 8009(d), Appellants-Movants respectfully request that the Clerk of the Bankruptcy Court undertake the following actions to ensure the proper certification and transmittal of the Appellate Record to the United States District Court:

1. **Forward the Attached Joint Stipulated Appellate Record to the Honorable Chief Judge Barbara Ellis-Monro for Review and Approval:** In accordance with Rule 8009(d), the attached Joint Stipulated Appellate Record requires review and approval by the Bankruptcy Court to ensure its accuracy and completeness. Rule 8009(d)(1) explicitly provides that "If the statement is accurate, it—together with any additions that the bankruptcy court may consider necessary to a full presentation of the issues on appeal— ***must be approved by the bankruptcy court***." Appellants-Movants respectfully request that the Clerk promptly forward the attached "accurate" Joint Stipulated Appellate Record to Chief Judge Ellis-Monro for her review and approval.

2. **Certification of Approved Joint Stipulated Appellate Record:** Upon the Bankruptcy Court's approval of the Joint Stipulated Appellate Record, Appellants-Movants respectfully request that the Clerk certify the approved statement to the United States District Court for the Northern District of Georgia, Case No. 25cv00613 (NDGA) (MLB), as the official Record on Appeal, pursuant to Rule 8009(d)(2) of the Federal Rules of Bankruptcy Procedure. Rule 8009(d)(2) mandates that "***If the bankruptcy court approves the statement, it must be certified to the court where the appeal is pending as the record on appeal***."

3. **Transmittal of Certified Record to District Court Clerk:** Following certification by the Bankruptcy Court, Appellants-Movants respectfully request that the Bankruptcy Clerk transmit forthwith the certified Joint Stipulated Appellate Record to the Clerk of the United States District Court for the Northern District of Georgia, in accordance with Rule 8009(d)(3) and Rule 8010 of the Federal Rules of Bankruptcy Procedure. Rule 8009(d)(3) directs that "***The bankruptcy clerk must then transmit it to the clerk of that court within the time provided by Rule 8010***."

Appellants-Movants submit this Joint Stipulated Appellate Record in good faith and in the interest of judicial economy, to streamline the appellate process and to focus the District Court's review

on the dispositive jurisdictional and sanctioning issues presented in this appeal. We respectfully request the Bankruptcy Court's prompt attention to this matter to facilitate the timely progression of this appeal before the United States District Court.


Respectfully submitted,

/s/ Ulysses T. Ware

ULYSSES T. WARE
Attorney in Fact for Appellants-Movants
Ulysses T. Ware and Group Management

**Attachments:**

1. **(F-7, F-8, and F-9) attachments  02.21.25 re: In re Group Management Corp., 03-93031 (BC NDGA), Chapter 11, Rule 8009(d) Appellants' and Appellees' Joint Stipulated Appellate Record.**

1.    **Supplement F-7—Attached hereto separately and made a part hereof, incorporated by reference. (Appellants' Declaration of Actual and/or Constructive Notice of Adverse Consequence to all Appellees).**

## 2.    Supplement F-8 (Declaration of Appellees Baker & McKenzie, LLP and Lawrence B. Mandala, Esq. regarding the Ill-Advised Form S-2 Frivolous Registration Statement).

### Memorandum regarding F-8

This memorandum presents a summary of Document F-8, analyzed from the Appellants-Movants' perspective as a critical supplement to the Rule 8009(d) Joint Stipulated Appellate Record. This analysis reveals how Document F-8, the so-called "Declaration of Baker & McKenzie, LLP and Lawrence B. Mandala, Esq. regarding the Ill-Advised Form S-2 Frivolous Registration Statement," far from mitigating Appellees' liability, instead serves as a **powerful and self-incriminating admission** that inadvertently **validates and amplifies the core issues** meticulously articulated by Appellants-Movants in their Rule 8009(d) Joint Stipulated Statement of Issues Presented on Appeal (F-1).

### A.    Summary of Supplement F-8 (Appellants' Perspective):

Supplement F-8, masquerading as a "Declaration" in defense of Baker & McKenzie, LLP, and Lawrence B. Mandala, Esq.'s, demonstrably indefensible conduct, is in reality a **transparently weak and self-serving attempt at damage control**, riddled with carefully parsed half-truths, glaring omissions, and implicit concessions that ultimately **undermine Appellees' already crumbling legal position** and **irrefutably bolster the strength of Appellants-Movants' appeal**. Far from exonerating Baker & McKenzie, LLP, and Lawrence Mandala, Esq., Document F-8 serves as a **devastating self-inflicted wound**, providing further evidentiary support for Appellants-Movants' allegations and ***highlighting the endemic bad faith and fraudulent intent underlying Appellees' protracted obstruction of justice***.

While feigning a defense, Document F-8 fundamentally **collapses under the weight of its own omissions and evasions**. The Declaration's carefully crafted implicit denials of negligence and fraud ring hollow in the face of its **startling failure to address, let alone refute, the dispositive legal and factual issues** that lie at the very heart of Appellants-Movants' appeal and sanctions motions. Indeed, Document F-8, through its strategic silences and transparently weak

assertions, effectively **concedes the most damaging aspects of Appellants-Movants' case**, validating the core arguments meticulously detailed in the Rule 8009(d) Joint Stipulated Statement of Issues Presented on Appeal (F-1).

**B.      Document F-8 as Material Support for Appellants' Core Appellate Issues (F-1):**

Examining Document F-8 through the prism of Appellants-Movants' Rule 8009(d) Joint Stipulated Statement of Issues Presented on Appeal (F-1), it becomes manifestly apparent how Baker & McKenzie, LLP, and Lawrence Mandala, Esq.'s, "Declaration" **reinforces and substantiates Appellants' key appellate arguments** across each of the dispositive issues outlined in F-1:

1. **Issue 1: Lack of Subject Matter Jurisdiction Over Criminal Usury (F-1, Point 1):** Document F-8, in its desperate attempt to defend the "ill-advised Form S-2 Frivolous Registration Statement," **studiously avoids any mention of the criminal usury** at the heart of the predatory convertible promissory notes (GX 1-4). This telling omission serves as a **tacit admission** that Baker & McKenzie, LLP, and Lawrence Mandala, Esq., cannot, and dare not, contest the demonstrably criminally usurious nature of these void *ab initio* debt instruments, thus implicitly conceding the Bankruptcy Court's fundamental lack of Article III subject matter jurisdiction, as powerfully argued by Appellants-Movants in F-1, Point 1.

2. **Issue 2: Violation of New York Criminal Usury Law (F-1, Point 2):** Similarly, Document F-8 remains **conspicuously silent** regarding the **undisputed violation of New York Penal Law § 190.40**, the criminal usury law, by the Predatory Criminal Usury Subject Matter (GX 1-5). This silence further reinforces Appellants-Movants' argument, presented in F-1, Point 2, that the underlying debts are indeed criminally usurious and void *ab initio* under controlling New York law, a critical element in establishing the Bankruptcy Court's jurisdictional deficiency.

3. **Issue 3: Void Ab Initio Status and Violation of Public Policy and Federal Securities Laws (F-1, Point 3):** Document F-8, while attempting to defend the Form SB-2, **utterly**

**fails to address the dispositive legal argument** that the Predatory Criminal Usury Subject Matter is null and void *ab initio*, unenforceable, uncollectible, and violative of public policy and federal securities laws. This omission implicitly concedes the validity of Appellants-Movants' contention, outlined in F-1, Point 3, that the Bankruptcy Court's attempt to adjudicate claims based on these illegal and void debts is itself unlawful and jurisdictionally improper.

4. **Issue 4: Article III Standing of Unregistered Broker-Dealer Appellees (F-1, Point 4):** Document F-8 makes no attempt whatsoever to address the **fundamental Article III standing deficiency** of Kilpatrick Townsend & Stockton LLP's unregistered broker-dealer clients. This silence constitutes a **tacit admission** that Baker & McKenzie, LLP, and Lawrence Mandala, Esq., have no legitimate basis to contest Appellants-Movants' argument, presented in F-1, Point 4, that these Appellees, as certified unregistered broker-dealers, patently lack the constitutionally required "legally protected interest" and "concrete injury in fact" to invoke federal jurisdiction in the Bankruptcy Court.

5. **Issue 9: Preclusive Effect of SDNY Final Judgment and Orders (F-1, Point 9):** Most tellingly, Document F-8 **completely ignores the dispositive preclusive effect of Judge Sand's Dec. 20, 2007, Dkt. 90, *voluntary* Rule 41(a)(2) superseding 2007 Final Judgment** in the 02cv2219 (SDNY) litigation and the principles of *res judicata*.[2] This glaring omission, in a document purporting to defend Baker & McKenzie, LLP, and Lawrence Mandala, Esq.'s, actions, is a **stunning and self-incriminating oversight**. It serves as a **de facto concession** that Appellees-Respondents are indeed legally barred by

---

[2] Although Judge Sand's Rule 41(a)(2) *voluntary* final judgment was entered after the date of Baker & McKenzie, LLP's materially misleading, deceitful, frivolous, and manifestly fraudulent Declaration, F-8, Baker nor Mandala have fulfilled their ethical and professional duties and obligations to the federal courts with respect to ABA Rule of Professional Conduct Rule 3.3 and made a full and ***complete duty of complete candor declaration*** to the Courts (02cv2219 (SDNY), 03-93031 (BC NDGA), 04cr1224 (SDNY), and 25cv00613 (NDGA)) and explained the new information regarding KTS' clients'—that is, FINRA's senior executive Marcia E. Asquith, Esq's May 17, 2021, officially confirmed and verified unregistered broker-dealer status for each of KTS' clients, (see Dkt. 11 in 03-93031), which rendered its previous Declaration, F-8, materially inaccurate, false, misleading, and misrepresenting the facts.

*res judicata* from relitigating the claims at issue in the 03-93031 Bankruptcy Case, as forcefully argued by Appellants-Movants in F-1, Point 9, and throughout their appeal.

In conclusion, Supplement F-8, the purported "Declaration of Baker & McKenzie, LLP and Lawrence B. Mandala, Esq.," while intended as a defensive maneuver, ultimately serves as a **powerful and unintended testament to the strength and validity of Appellants-Movants' core appellate arguments**. This document, riddled with strategic silences, implicit concessions, and demonstrably weak denials, inadvertently, but negligently, **reinforces the compelling legal and factual narrative** meticulously constructed by Appellants-Movants and underscores the increasingly untenable and legally bankrupt position of Baker & McKenzie, LLP, Lawrence Mandala, Esq., and their co-Appellees. Document F-8 should therefore be strategically incorporated into Appellants-Movants' Joint Stipulated Appellate Record as further and compelling evidentiary support for their claims and as a testament to the self-inflicted wounds of a desperate and demonstrably failing defense.

Respectfully,

/s/ Ulysses T. Ware

### 3.    Supplement F-9 (Declaration of Group Management's former CEO Elorian Landers).

**Memorandum regarding F-9: Declaration of Elorian Landers, Group Management Corp.'s former CEO.**

This memorandum presents the Appellants' concise summary of Document F-9, the Declaration of former Group Management Corp. CEO, Elorian Lander, a factually strategic and **decisive, and invaluable piece of evidence** that unequivocally **confirms and validates Appellants-Movants' core appellate issues** and delivers a **crippling blow to the already untenable position of Appellees-Respondents**. Document F-9, when properly understood serves as a **potent weapon** for the District Court in reviewing Appellants' issues on appeal, and moreover, providing irrefutable support and further exposing the fraudulent and bad-faith nature of Appellees' protracted conspiracy and obstruction of justice.

### A.    Summary of Supplement F-9 (Appellants' Perspective):

Supplement F-9, the "Declaration of Elorian Lander, Former CEO of Group Management Corp.," must be recognized for what it truly is: a **remarkable and truthful review of the fact in support for Appellants-Movants**. While providing background context, Lander's Declaration, in reality, functions as a **damning and irrefutable confirmation** of the predatory lending context, jurisdictional deficiencies, and underlying illegality that form the bedrock of Appellants-Movants' Rule 8009(d) Joint Stipulated Appellate Record (F-1). Document F-9 is not merely supportive; it is **decisive corroboration**, dismantling Appellees-Respondents' already fragile defenses and paving the way for a swift and unequivocal victory in the United States District Court.

Strategically integrated as Supplement F-9 to the Rule 8009(d) Joint Stipulated Appellate Record, the Declaration of Elorian Lander, former CEO, **affirmatively validates and irrefutably substantiates Appellants-Movants' key appellate arguments** across each of the dispositive issues presented in F-1, delivering *a devastating and self-inflicted blow* to the Appellees' fraudulent enterprise:

1. **Issue 1: Lack of Subject Matter Jurisdiction Over Criminal Usury (F-1, Point 1)** – *F-9 Irrefutably Establishes Predatory Lending Context, Undermining Jurisdictional Basis*: Elorian Lander's Declaration (F-9) directly and powerfully establishes the **unmistakably predatory lending context** surrounding the convertible promissory notes (GX 1-4), the very instruments at the heart of Appellees-Respondents' baseless claims, Dkt. 6, 11, 13, 14, 15, 16, 28, 256, 258, 263, 274, 275, 278, and 286. Lander's detailed account of Group Management Corp.'s dire financial straits, its desperate search for capital, and its forced entry into manifestly exploitative financing arrangements with entities later revealed to be unregistered broker-dealers, (KTS' clients, see Dkt. 11), **irrefutably demonstrates** that GX 1-4 were not legitimate debt instruments, but rather tools of predatory lending and criminal usury. This explicit factual confirmation of the predatory context, emanating from the Debtor's former CEO, **obliterates any remaining vestige of legitimacy** from Appellees-Respondents' claims and definitively **proves the 03-93031 Bankruptcy Court's utter lack of all Article III subject matter jurisdiction over GX 1-4, and GX 5**, as forcefully argued by Appellants-Movants in F-1, Point 1. Document F-9 thus serves as a **smoking gun**, conclusively establishing the jurisdictional void at the core of the 02cv2219 (SDNY), and 03-93031 Bankruptcy Court proceedings.

2. **Issue 2: Violation of New York Criminal Usury Law (F-1, Point 2)** – *F-9 Directly Supports Criminal Usury Finding, Compounding Illegality*: Lander's Declaration (F-9) provides further direct support for the **inescapable conclusion that the Predatory Criminal Usury Subject Matter (GX 1-5) is criminally usurious** and violative of New York Penal Law § 190.40. While not explicitly using the term "criminal usury," Lander's detailed description of the loan terms, the exorbitant interest rates exceeding 2000% per annum, and the coercive and exploitative nature of the financing arrangements **affirmatively demonstrates** the hallmarks of criminal usury under New York law. This factual account, provided by the Debtor's former CEO, provides ***independent and compelling corroboration*** for Appellants-Movants' argument, presented in F-1, Point 2, that the underlying debts are criminally usurious and void *ab initio*, further cementing the illegality and jurisdictional impropriety of the Bankruptcy Court's actions.

Page **13** of **17**
Friday, February 21, 2025
(16-2) (Part 16-2) re Feb. 12, 2025, Cover letter to the Bankruptcy Clerk (NDGA) regarding supplemental
Rule 8009(d) filings, to wit: F-7 and F-8.

3. **Issue 3: Void Ab Initio Status and Violation of Public Policy and Federal Securities Laws (F-1, Point 3) –** *F-9 Underscores Unenforceability and Illegality, Destroying Appellees' Claim Basis***:** Lander's Declaration, in its factual recitation of the predatory lending scheme and the unlawful nature of the underlying transactions, directly **underscores the void** *ab initio* **status** of the Predatory Criminal Usury Subject Matter and its inherent **violation of public policy and federal securities laws**. By detailing the coercive and exploitative context of the loans, GX 1-4, Lander's Declaration **powerfully reinforces Appellants-Movants' argument**, presented in F-1, Point 3, that these debt instruments *are fundamentally unenforceable and uncollectible*, and that the Bankruptcy Court's attempt to adjudicate claims based on such illegal and void obligations, Dkt. 11, 13, 15, and 16, is a clear usurpation of federal judicial power. Document F-9 thus serves to **demolish any semblance of legitimacy** remaining in Appellees-Respondents' claims.

4. **Issue 4: Article III Standing of Unregistered Broker-Dealer Appellees (F-1, Point 4) –** *F-9 Confirms Transactions with Unregistered Entities, Eradicating Standing***:** Lander's Declaration, through its implicit acknowledgment of dealings with entities later certified by FINRA as unregistered broker-dealers, directly **confirms the fatal Article III standing deficiency** of Kilpatrick Townsend & Stockton LLP's clients. Lander's recitation of Group Management Corp.'s financial interactions with Alpha Capital, AG, Stonestreet, L.P., Markham Holdings, L.P., Amro International, S.A., and LH Financial Services Corp., **affirmatively substantiates Appellants-Movants' factual assertions** and **powerfully reinforces their legal argument**, presented in F-1, Point 4, that these unregistered broker-dealers patently lack the constitutionally required "**legally protected interest**" and "**concrete injury in fact**" to invoke federal jurisdiction, as their claims are predicated on void and illegal transactions, (see NYS Penal Law, section 190.40 and 18 USC §§2, 371, 1951(a), 1961(6)(B), and 1962(a-d)) with a Chapter 11 Debtor while a fiduciary of the Chapter 11 Debtor. Document F-9 thus provides critical factual validation and support for Appellants-Movants' Article III standing challenge, further undermining the jurisdictional legitimacy of the Bankruptcy Court proceedings.

5. **Issue 9: Preclusive Effect of SDNY Final Judgment and Orders (F-1, Point 9) –** *F-9 Exacerbates Baker & McKenzie's Ethical Breach and Tacitly Confirms SDNY*

Page **14** of 17
Friday, February 21, 2025
(16-2) (Part 16-2) re Feb. 12, 2025, Cover letter to the Bankruptcy Clerk (NDGA) regarding supplemental
Rule 8009(d) filings, to wit: F-7 and F-8.

***Judgment's Dispositive Force***: Document F-8, the self-styled "Declaration" of Baker & McKenzie, LLP, and Lawrence Mandala, Esq., not only **strategically evades** any substantive engagement with the dispositive preclusive effect of Judge Sand's 2007 Final Judgment, but, when critically examined in light of the timeline of events,[3] **actively compounds Baker & McKenzie, LLP, and Lawrence Mandala, Esq.'s, egregious breach of professional ethics and duty of candor to the federal courts**. Appellants-Movants emphasize the following damning and irrefutable fact:

Despite this **critical temporal reality**, Baker & McKenzie, LLP, and Lawrence Mandala, Esq., have **willfully failed and refused to supplement or amend their Declaration F-8** to acknowledge, disclose, or address the **sea change** in the legal landscape wrought by Judge Sand's 02cv2219 (SDNY) voluntary, Rule 41(a)(2) superseding Dkt. 90, December 20, 2007, Final Judgment. This deliberate and ethically reprehensible omission is not merely an oversight of Baker, KTS, the U.S. Trustee's Office, Region 21, and Mandala; it is a **calculated act of deception**, designed to perpetuate a demonstrably false and misleading factual and legal narrative before the federal courts and to conceal the **inescapable preclusive res judicata force** of Judge Sand's Final Judgment in favor of the Appellants, Dkt. 90.

Baker & McKenzie, LLP, KTS', the Office of the U.S. Trustee, Region 21 (Mary Ida Townson, Esq. and Jeneane Treace, Esq., officers of the court), and Lawrence Mandala, Esq.'s, **continued strategic silence** regarding the dispositive preclusive effect of Judge Sand's 2007 Final Judgment, *especially in light of their affirmative duty of complete candor to the tribunal under ABA Rule of Professional Conduct Rule 3.3* and the intervening entry of this Final Judgment *after* the execution of their Declaration F-8, is not merely negligent or inadvertent – it is a **deliberate and unethical act of concealment and misrepresentation**. Their silence, in this context, constitutes a **powerful and damning**

---

[3] Baker & McKenzie, LLP, and Lawrence B. Mandala, Esq.'s, Declaration F-8 was executed and filed before the entry of Judge Sand's Rule 41(a)(2) voluntary final judgment (Dkt. 90, 02cv2219 SDNY) on December 20, 2007.

**tacit concession** that Appellees-Respondents have no legitimate basis to contest the binding preclusive effect of Judge Sand's Final Judgment, and that their continued litigation of claims in the 03-93031 Bankruptcy Case and the 25cv00613 (NDGA) appeal is demonstrably barred by *res judicata*, as forcefully and repeatedly argued by Appellants-Movants in F-1, Point 9, and throughout these protracted proceedings. Document F-8, therefore, stands as a **monument to Baker & McKenzie, LLP, and Lawrence Mandala, Esq.'s, ethical and moral bankruptcy**, underscoring the unanswerable force of Appellants-Movants' *res judicata* argument and further cementing the inevitability of Appellees-Respondents' ultimate legal defeat.

In conclusion, Supplement F-9, the "Declaration of Elorian Lander, Former CEO of Group Management Corp.," far from being a neutral or inconsequential filing, emerges as a **powerful and unanticipated weapon in Appellants-Movants' arsenal**. This document, through its inadvertent admissions, implicit confirmations, and strategic silences, **affirmatively validates Appellants-Movants' core narrative, irrefutably substantiates their key factual assertions, and delivers a devastating and self-inflicted blow to the increasingly desperate and legally bankrupt position of Appellees-Respondents**. Document F-9 should therefore be strategically highlighted and leveraged as a critical component of the Rule 8009(d) Joint Stipulated Appellate Record, further paving the way for Appellants-Movants' ultimate and richly deserved victory in the United States District Court.

Respectfully submitted,

/s/ Ulysses T. Ware

*Ulysses 2 Ware*

February 21, 2025

## Certificate of Service

I, Ulysses T. Ware, attorney in fact for the Appellants, hereby certify under penalty of perjury that on this 21st day of February 2025, I caused to be served a true and correct copy of the foregoing **COVER LETTER REGARDING FILING OF RULE 8009(d) JOINT STIPULATED APPELLATE RECORD** and attached **JOINT STIPULATED APPELLATE RECORD (16-2) (Part 16-2) 02.21.25 re:** *In re Group Management Corp.*, **03-93031 (BC NDGA), Chapter 11, Rule 8009(d) Appellants' and Appellees' Joint Stipulated Appellate Record** via electronic filing with the Bankruptcy Court and by U.S. Mail to the Office of the Clerk, United States Bankruptcy Court, Northern District of Georgia, Richard B. Russell Federal Building and United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, Georgia 30303.

/s/ Ulysses T. Ware

Ulysses T. Ware

# End of document

# 03-93031: Rule 8009(d) F-7

Re: (13-9) (Part 15-9) 02.16.25 re: Appellants' Final Memorandum of (i) Actual Notice of the *In re Group Management Corp.*, 03-93031 (BC NDGA), and *In re Group Management Corp.*, 25cv00613 (NDGA) (MLB) proceedings, and (ii) Adverse Consequences, civil and penal, for each Appellee named in 25cv00613 (NDGA) (MLB), Ex. 1, infra, in their personal and individual and/or if warranted official capacity – Supported by *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272-75 (2010).

### The Office of Ulysses T. Ware

123 Linden Blvd., Ste 9-L
Brooklyn, NY 11226
(718) 844-1260
utware007@gmail.com

February 16, 2025, 12:35:39 PM12:35 PM

**VIA ELECTRONIC FILING—Email**

**TO: ACTUAL NOTICE TO EACH APPELLEE, THEIR PRIVIES, AGENTS, PROXIES, SURROGATES, ALTER-EGOS, AND ALL THOSE IN ACTIVE CONCERT THEREWITH, JOINTLY AND SEVERALLY, NAMED IN CASE NO. 25cv00613 (NDGA) (MLB).**

Thank you for your attention to this critically important Article III "threshold" jurisdiction and standing constitutional matter.

**RESPECTFULLY SUBMITTED,**

**For Appellants: GROUP MANAGEMENT and Ulysses T. Ware**

*Ulysses T. Ware*

**Submitted by:**
**/s/ Ulysses T. Ware**
**The Office of Ulysses T. Ware**
123 Linden Blvd., Ste 9-L
Brooklyn, NY 11226
(718) 844-1260
Utware007@gmail.com
February 16, 2025

(13-9) (Part 15-9) re Appellants' Final Actual Notice of Adverse Consequences, civil and penal, for each Appellee, their privies, agents, proxies, surrogates, alter-egos, and all those in active concert therewith.

# **Table of Contents**

I. FINAL ACTUAL NOTICE OF *IN RE GROUP MANAGEMENT CORP.* PROCEEDINGS (CASE NOS. 03-93031 (BC NDGA) & 25cv00613 (NDGA) (MLB)).......................................................................... 3

II. ACTUAL NOTICE OF ADVERSE, DIRE, AND DISASTROUS PENAL AND PECUNIARY CONSEQUENCES FOR APPELLEES', THEIR PRIVIES, AGENTS, PROXIES, SURROGATES, ALTER-EGOS, AND AL THOSE IN ACTIVE CONCERT THEREWITH WILLFUL NON-RESPONSE AND WAIVER OF PROCEDURAL DUE PROCESS...................................................... 5

III. APPELLEES' WILLFUL AND KNOWING WAIVER, FORFEITURE, AND ABANDONMENT OF PROCEDURAL DUE PROCESS RIGHTS UNDER *ESPINOSA.*............. 11

IV. FINAL NOTICE AND OPPORTUNITY FOR IMMEDIATE MITIGATION: ........................ 13

v. APPELLANTS' ACTUAL NOTICE OF ADVERSE CONSEQUENCES.................................... 13

Exhibit 1--Dkt. 281—The Bankruptcy Clerk's In re Group Management Corp., 03-93031 (BC NDGA) and 25cv00613(NDGA) (MLB) *Actual Public Notice* to Appellees. ................................... 16

Exhibit 2—GA OIC's Regulatory finding of bad faith violation of GA statutory insurance law by KTS, GSL, and Nall & Miller, LLP ............................................................................................... 18

Exhibit 3—GA OIC's notice of criminal investigation of conspiracy to commit insurance fraud by KTS, GSL, and Nall & Miller, LLP ............................................................................................... 19

Certificate of Service............................................................................................................................ 21

Certificate of Service—John F. King .................................................................................................. 22

Appellants-Movants, Ulysses T. Ware and Group Management (collectively, "Appellants"), Final Judgment Prevailing Parties in the 02cv2219 (SDNY) litigation and Appellants in the above-referenced appeal from the Bankruptcy Court, Case No. 03-93031 (WLH) (Bankr. N.D. Ga.), currently pending before the United States District Court for the Northern District of Georgia (Appellate Dkt. 279, Case No. 25cv00613 (MLB)), ***hereby submit this comprehensive Memorandum to formally and unequivocally actually and constructively notify each Appellee, their privies, agents, proxies, surrogates, alter-egos, and all those in active concert therewith, jointly and severally, of the following critical matters***:

## I. FINAL ACTUAL NOTICE OF *IN RE GROUP MANAGEMENT CORP.* PROCEEDINGS (CASE NOS. 03-93031 (BC NDGA) & 25cv00613 (NDGA) (MLB)).

Each Appellee is hereby formally actually and constructively notified and, informed, reminded that you have received, and will continue to receive, **extensive and irrefutable actual and constructive notice** of the ***In re Group Management Corp.***, Case No. 03-93031 (WLH) (Bankr. N.D. Ga.) Chapter 11 proceedings, and the related appeal currently pending before the United States District Court for the Northern District of Georgia, Case No. 25cv00613 (NDGA) (MLB), see Ex. 1, infra. This Actual Notice is established through, but not limited to, the following documented channels:

1. **Direct and Repeated Communications from Appellants-Movants:** Appellants-Movants, through their counsel, Ulysses T. Ware, have engaged in repeated and documented direct communications with each Appellee, and/or their designated legal counsel, via electronic mail and U.S. Mail. These communications, including but not limited to the (13-5A), (13-5B), (13-7), Dkt. 278, 279, Dkt. 281, and other referenced communications, have explicitly and comprehensively notified each Appellee of:

   a. The existence and nature of the ***In re Group Management Corp.***, Case No. 03-93031 (WLH) (Bankr. N.D. Ga.) Chapter 11 proceedings and the pending appeal, Case No. 25cv00613 (NDGA) (MLB), see Ex. 1, infra.

b. The specific Docket Numbers and Court designations for both the Bankruptcy Court and District Court proceedings. Id.

c. The nature and substance of Appellants-Movants' Rule 9014/12(h)(3) Jurisdictional Notice of Appeal (Dkt. 279) and the core jurisdictional and standing issues raised therein. Id.

d. Appellants-Movants' demands for mandatory insurance disclosures pursuant to Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure and OCGA § 33-3-28(a)(1), (2). (Part 14-24).

e. Appellants-Movants' intent to file a Motion for Severance of Particular Appellees, Rule 9011, 28 U.S.C. § 1927, Inherent Power Sanctions, and Entry of Partial Final Judgment in Appeal, including a Money Judgment in the sum certain amount of $5.2225 billion. Id.

f. Clear and explicit deadlines for compliance with mandatory disclosure obligations and for responding to Appellants-Movants' "meet and confer" requests. (Part 15)

g. Unequivocal warnings regarding the adverse legal and financial consequences of continued non-response and obstructionist conduct, including the waiver of procedural due process and the imposition of substantial sanctions and a multi-billion dollar Money Judgment. (Parts 14 and 15).

2. **Official Bankruptcy Court Docket – Case No. 03-93031 (WLH) (Bankr. N.D. Ga.):** The official docket of *In re Group Management Corp.*, Case No. 03-93031 (WLH) (Bankr. N.D. Ga.) is a public record, providing constructive notice to all parties in interest, including each Appellee named herein, of all filings, orders, and "activity" in the Chapter 11 proceedings. For Baker & McKenzie, LLP listing as creditors (interested parties) on the official Bankruptcy Court docket and in the Debtor's schedules, constitutes formal and legally sufficient notice of all proceedings therein, including the orders being appealed and Appellants-Movants' jurisdictional challenges—as well as actual notice to their purported legal counsel Thomas A. Leghorn, Esq. (Part 15-5A, 15-5B).

3. **Official District Court Docket – Case No. 25cv00613 (NDGA) (MLB):** The official docket of the appeal, ***In re Group Management Corp.***, Case No. 25cv00613 (NDGA) (MLB), before the United States District Court for the Northern District of Georgia, is also a public record, providing constructive notice to all Appellees of the pendency of the appeal, the filing of Appellants-Movants' Notice of Appeal (Dkt. 279), and all subsequent filings and deadlines in the appellate proceedings. See Ex. 1, infra.

4. **Judicial Notice of Public Record and Notoriety of Proceedings:** The protracted and widely publicized nature of the ***In re Group Management Corp.*** Bankruptcy Case and the related 02cv2219 (SDNY) litigation, spanning over two decades, provides further constructive notice to each Appellee of the ongoing legal disputes and the issues currently before the District Court in Appeal Dkt. 279. See Dkt. 65 and Dkt. 90, 02cv2219 (SDNY).

## II. ACTUAL NOTICE OF ADVERSE, DIRE, AND DISASTROUS PENAL AND PECUNIARY CONSEQUENCES FOR APPELLEES', THEIR PRIVIES, AGENTS, PROXIES, SURROGATES, ALTER-EGOS, AND AL THOSE IN ACTIVE CONCERT THEREWITH WILLFUL NON-RESPONSE AND WAIVER OF PROCEDURAL DUE PROCESS.

Each Appellee is hereby formally actually notified and warned that your continued willful non-response to Appellants-Movants' demands, your willful and bad faith conspicuous absence from any substantive engagement in these proceedings, and your knowing and deliberate waiver of procedural due process rights will result in the following severe adverse penal and pecuniary consequences, ***for which each Appellee will be held jointly and severally liable***:

1. **Entry of Partial Final Judgment: $5.2225 Billion Money Judgment: Appellants-Movants will imminently seek, and the United States District Court is fully authorized and justified in entering based on the Rule 8009(d) Joint Consent Stipulated Appellate Record (13-6) (Part 15-6), a Partial Final Judgment against each Appellee, *jointly and severally*, personally and individually, *in the sum certain amount of $5.2225 billion*.** This Money Judgment is sought as a just and proportionate remedy and sanction for Appellees'

clearly unlawful and vexatious conduct, including, but not limited to, the following legally and factually substantiated grounds:

a. **Racketeering Liability (18 U.S.C. § 1962(d)):** Appellees' demonstrable participation in an ongoing pattern of racketeering activity, in furtherance of a criminal conspiracy to loot the 03-93031 Chapter 11 estate of +$522 million in insider-trading profits and to obstruct justice in the Bankruptcy Court and related appellate proceedings, unequivocally exposes each Appellee to joint and several civil liability under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This RICO liability arises from Appellees' predicate acts of bankruptcy fraud (11 U.S.C. §§ 152, 157), wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), money laundering (18 U.S.C. §§ 1956-57), Hobbs Act violations (18 U.S.C. § 1951(a)), and obstruction of justice (18 U.S.C. § 1503), all of which are amply supported by the factual record in the 03-93031 Bankruptcy Case, the 02cv2219 (SDNY) litigation, and Appellees' own tacit admissions through their willful non-response to Appellants-Movants' demands and allegations. The requested $5.2225 billion Money Judgment represents a conservative and proportionate assessment of the damages and RICO forfeiture penalties warranted by Appellees' extensive and egregious racketeering enterprise.

b. **Aiding and Abetting Criminal Usury and Hobbs Act Violations:** Appellees' knowing and willful aiding and abetting of Kilpatrick Townsend & Stockton LLP's *unregistered broker-dealer clients* (identified in Dkt. 11 of the 03-93031 Bankruptcy Case) in the unlawful enforcement and collection of predatory criminal usury debts (GX 1-4 and GX 5, bearing interest rates exceeding 2000% per annum, void *ab initio* under New York Penal Law § 190.40) directly and proximately caused substantial harm to Group Management Corp., Group Management, Ulysses T. Ware, and the Chapter 11 estate, and exposes each Appellee to substantial civil and penal liability. This unlawful debt collection activity, 03-93031, Dkt. 6, 11, 13, 14, 15, 16, 28, 256, 258, 274, 275, and 278, was conducted in willful and knowingly, or reckless disregard for the law, violation of the Hobbs Act, 18 U.S.C. §§ 1951(a), 1961(6)(B), and New York Penal Law § 190.40 (**a Class E Felony**),

further justifies the imposition of a substantial Money Judgment to redress the damages caused by Appellees' complicity in this criminal enterprise and to deter future violations of federal and state criminal usury and racketeering laws.

c. **Professional Malpractice and Fraudulent Misconduct (Baker & McKenzie, LLP, Lawrence B. Mandala, Esq., Robert H. Albaral, Esq., London Fischer LLP, Thomas A. Leghorn, Esq.):** The factual record in the 03-93031 Bankruptcy Case, 25cv00613 (NDGA), see (Parts 15-5, 15-5A, and 15-5B), and the related 02cv2219 (SDNY) litigation, plainly establishes the irrefutable gross negligence and fraudulent misconduct of Baker & McKenzie, LLP, and Lawrence B. Mandala, Esq., in their preparation of an egregiously negligent and fraudulent legal opinion letter and Form SB-2. This fraudulent legal work product was instrumental in enabling Kilpatrick Townsend & Stockton LLP's unregistered broker-dealer clients to perpetrate their predatory criminal usury scheme and to initiate the vexatious and jurisdictionally baseless claims in the 03-93031 Bankruptcy Case, Dkt. 11, 15, and 16. This professional malpractice and fraudulent misconduct, which proximately caused massive harm and damages to Group Management Corp., Group Management, Ulysses T. Ware, and the Chapter 11 estate, subjects Baker & McKenzie, LLP, London Fischer LLP, and their attorneys to substantial professional liability, compensatory damages, and punitive damages, all of which are appropriately encompassed within the requested $5.2225 billion Money Judgment.

d. **Theft and Conversion of Chapter 11 Estate Assets:** Appellees' knowing and willful participation in the theft, concealment, and conversion of +$522 million in strict−liability insider−trading profits (as formally determined by the United States District Court for the Southern District of New York (Sand, J.) on Aug. 13, 2003, 02cv2219 (SDNY), Dkt. 65, (15 USC 78p(b) statutory insider status for each of Appellee KTS' 02cv2219 (SDNY)), (see 03-93031, Dkt. 11), KTS' clients, Exhibit 1 to Joint Stipulated Appellate Record), which constitute assets of the Chapter 11 estate under 11 U.S.C. § 541(a)(1), and the +$522 million in strict−liability insider−trading profits (as formally determined

by the United States District Court for the Southern District of New York (Sand, J.) are required to be turned over, 11 USC § 542(a), for administration, and (ii) the $675,000 in stolen legal fees (unlawfully extracted by Appellee Edward T.M. Garland, Manibur S. Arora, Michael F. Bachner, Donald F. Samuel, Janice Singer, and David B. Levitt) from Appellants-Movants under duress and coercion), directly and proximately caused massive pecuniary harm to the Chapter 11 estate and its legitimate creditors.

e.  Appellees' direct and/or indirect willful and bad faith participation in this unlawful scheme to loot the Chapter 11 estate--Hobbs Act 18 USC §§ 2, 152, 157, 371, 924(c), 1201-02, 131, 1343, 1344, 1346, 1503, 1951(a), 1956-57, 1958-59, 1961(6)(B), 1962(a-d), and 2071(a), (b) exposes each Appellee, jointly and severally, to liability for disgorgement, turnover of the stolen assets, and compensatory and punitive damages, all of which are appropriately included within the scope of the requested $5.2225 billion Money Judgment, which seeks to restore the stolen assets to the Chapter 11 estate and to redress the substantial harm caused by Appellees' unlawful criminal and tortious conduct.

f.  **Rule 9011 Sanctions:** Appellees' objectively frivolous and legally untenable opposition, Dkt. 6, 11, 13, 14, 15, 16; also see Parts 15-5, 15-5A, and 15-5B; and see also Ex. 2 and Ex. 3., infra, to Appellants-Movants' claims, and their willful obstruction of justice and abuse of process, warrant the imposition of substantial sanctions under Rule 9011 of the Federal Rules of Bankruptcy Procedure. Rule 9011(c)(2) explicitly authorizes the imposition of "monetary sanctions," including "payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Appellees' sanctionable conduct, including their baseless procedural objections, their willful non-compliance with mandatory insurance disclosure obligations, and their vexatious multiplication of proceedings, has directly caused Appellants-Movants to incur substantial and unnecessary attorneys' fees and expenses in prosecuting this appeal and in seeking to compel Appellees' compliance with basic legal and ethical obligations. The District Court is fully authorized and justified in imposing

substantial monetary sanctions under Rule 9011, payable directly to Appellants-Movants, to compensate them for these unwarranted and avoidable costs and to deter future sanctionable conduct by Appellees and others similarly situated.

g. **28 U.S.C. § 1927 Sanctions:** Appellees' vexatious and bad faith multiplication of proceedings, and their unreasonable and unwarranted refusal to comply with mandatory insurance disclosure obligations, provide a further and independent basis for the imposition of sanctions under 28 U.S.C. § 1927. 28 U.S.C. § 1927 explicitly authorizes a federal court to impose sanctions personally upon any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously…". Appellees' counsel, including but not limited to Thomas A. Leghorn, Esq., and Patrick N. Arndt, Esq., have demonstrably engaged in a pattern of unreasonable and vexatious conduct, including the interposition of frivolous procedural objections, the willful non-compliance with mandatory disclosure obligations, and the persistent refusal to engage in good faith "meet and confer" discussions, all of which have served to needlessly multiply the proceedings, increase the costs of litigation, and obstruct the efficient administration of justice. Sanctions under 28 U.S.C. § 1927, ***to be assessed personally*** against each Appellee[1] and their legal counsel, are therefore warranted to deter such abusive litigation tactics and to compensate Appellants-Movants for the unnecessary costs and expenses incurred as a direct result of this vexatious conduct.

h. **Inherent Power Sanctions:** The United States District Court possesses inherent power to sanction bad faith conduct and abuse of process, as repeatedly affirmed

---

[1] See Certificate of Service, infra, regarding Georgia's OIC John F. King's egregious 28 USC § 1927 violations, ***as a regulatory public official,*** which authorizes the District Court, Brown, J. in regard to the Rule 26(a)(1)(A)(iv) disclosure obligation ***to personally sanction John F. King in the sum certain amount of $457, 821.88*** for unnecessary, unreasonable and wholly unjustified litigation fees and expenses incurred by Appellants seeking to obtain the required OCGA §§ 33-3-28(a)(1), (2) disclosures from Appellees Nall & Miller, LLP, GSL, KTS, Baker & McKenzie, LLP, Thomas A. Leghorn, London Fischer, LLP, Manibur S. Arora, and FINRA. John F. King, as the Georgia OIC had the lawful authority to order the immediate disclosure and production of all insurance policies held by the Appellees, however, John F. King willfully abandoned his statutory regulatory duties and responsibilities and joined the criminal enterprise and has knowingly, willfully, in bad faith obstructed Appellants' access to necessary and required Rule 26(a)(1)(A)(iv) mandatory insurance information concerning the Appellees.

by the Supreme Court. ***Chambers v. NASCO, Inc.***, 501 U.S. 32, 43-46 (1991). This inherent power extends to the imposition of substantial monetary penalties, including the entry of a Money Judgment, where a party has acted in bad faith, vexatiously, or for oppressive reasons. Appellees' egregious and persistent pattern of misconduct in this matter, when viewed in its totality, including their participation in a RICO enterprise, their aiding and abetting of criminal usury and Hobbs Act violations, their willful obstruction of justice, their bad faith non-compliance with mandatory disclosure obligations, and their tacit admission of liability, constitutes a clear and egregious abuse of the judicial process that warrants the exercise of this Court's inherent power to impose sanctions commensurate with the gravity of their offenses. The requested $5.2225 billion Money Judgment is not merely compensatory, but is principally intended as a *punitive and deterrent* sanction, reflecting the extraordinary scale and egregious nature of Appellees' misconduct, and the imperative need to vindicate the integrity of the federal judicial system and to deter future abuses of similar magnitude.

i.  **Potential Criminal Referral and Investigation:** Appellees are hereby notified, with the utmost seriousness and gravity, that their documented conduct throughout the ***In re Group Management Corp.*** proceedings and the related appeal, including but not limited to the potential violations of 18 U.S.C. § 2071(a), (b) (Concealment, Removal, and Mutilation of Court Records), 18 U.S.C. § 152 and 157 (Bankruptcy Fraud), 18 U.S.C. § 1951(a) (Hobbs Act), and 18 U.S.C. § 1962(d) (RICO Conspiracy), will be formally referred to the United States Attorney's Office for the Northern District of Georgia and the Federal Bureau of Investigation for immediate criminal investigation and potential prosecution. The documented evidence of Appellees' potential criminal violations, including but not limited to the confessed violations of Bankruptcy Rule 5003 and 18 U.S.C. § 2071(a), (b) by Chief Bankruptcy Judge Barbara Ellis-Monro (Dkt. 278), ***warrants a full and comprehensive federal criminal investigation.*** Each Appellee is strongly and urgently advised to seek immediate ***independent criminal legal counsel*** regarding their potential exposure to federal criminal liability, and the imminent risk of

indictment, prosecution, and imprisonment, arising from their documented conduct in this matter.[2]

## III. APPELLEES' WILLFUL AND KNOWING WAIVER, FORFEITURE, AND ABANDONMENT OF PROCEDURAL DUE PROCESS RIGHTS UNDER *ESPINOSA*.

As explicitly established by the Supreme Court in ***United Student Aid Funds, Inc. v. Espinosa***, 559 U.S. 260 (2010), each Appellee, by virtue of your extensive actual notice of the ***In re Group Management Corp***. proceedings and the pending appeal, see Ex. 1, infra, and your deliberate and persistent failure to avail yourselves of the ample opportunities to be heard and to present any objections or defenses to the 03-93031 Bankruptcy Court (NDGA), have ***knowingly, willfully, and intentionally waived, forfeited, and abandoned*** **any procedural due process rights** you might otherwise have asserted in this matter.

The *Espinosa* Court explicitly held that due process requires only "notice reasonably calculated, under all the circumstances, to apprise ***interested parties*** [Appellees, et al.] of the pendency of the [25cv00613 (NDGA), see Dkt. 281, Ex. 1, infra] action and ***afford them an opportunity*** to present their objections,"[3] and that "actual notice of the filing and contents of Espinosa's plan" more than

---

[2] ***United States v. Grote***, 961 F.3d 105, 109 (2d Cir. 2020) ("Defendants Scott Tucker and Timothy Muir appeal their criminal convictions after a five-week jury trial in the U.S. District Court for the Southern District of New York (P. Kevin Castel, *J.* ) **on fourteen counts of racketeering, conspiracy, and fraud offenses arising out of the Defendants' operation of an illegal payday lending scheme. The evidence showed that from about 1997 to 2013, _the Defendants lent money at interest rates far in excess of those permitted under the laws of New York_** [cf., GX 1-4, interest rates exceeded 2000%] and other states in which their borrowers resided, and deceived borrowers as to the terms of the loans. ***The indictment included three counts of conducting an enterprise's affairs through the collection of unlawful usurious debt***, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Counts 2-4); one count of conspiracy to do the same, in violation of 18 U.S.C. § 1962(d) (Count 1); one count of wire fraud and one count of wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343, 1349 (Counts 5-6); **three counts of money laundering and conspiracy to launder money**, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), - (a)(1)(B)(i), - (h) (Counts 7-9); and five counts of making false statements in disclosures required by the Truth in Lending Act (TILA), in violation of 15 U.S.C. § 1611 (Counts 10-14). ***The Defendants were convicted on all counts***."). (emphasis added).

[3] The Bankruptcy Court, Dkt. 281, on Feb. 7, 2025, Ex. 1, infra, provided and gave ***actual and constructive public notice*** to each Appellee of their procedural due process right to participate in the 25cv00613 (NDGA)

satisfied this requirement, ***even absent formal service of a [Bankr. Rule 7000 et. seqs. adversarial proceeding] summons and complaint***. *Espinosa*, 559 U.S. at 272-273.[4] Your continued non-response and obstructionist conduct further solidify this waiver, forfeiture, and abandonment, and leave you without any good faith, Bankr Rule 9011(b)(1-4) nonfrivolous legitimate procedural or substantive basis to oppose Appellants-Movants' claims or the imminent entry of a Partial Final Judgment against you. As the *Espinosa* Court concluded, parties who fail to raise timely objections "***forfeited [their] arguments regarding the validity of service or the adequacy of the Bankruptcy Court's procedures***…". *Id.* at 276. (paraphrased) (emphasis added). Your silence is your binding forfeiture—***estoppel by acquiescence.***

---

Rule 9014/12(h)(3) Article III jurisdiction and standing appeal of Appellee KTS' unregistered broker-dealer clients' with respect to 18 USC §§1 2, 152, 157, 371, 924(c), 1201-02, 1341, 1343, 1344, 1346, 1503, 1956-57, 1958-59, 1961(6)(B), 1962(a-d), and 2071(a), (b) Hobbs Act predatory criminal usury unlawful debt collection activities, to wit: Dkt. 6, 11, 13, 14, 15, 16, 28, 256, 258, 263, 274, 275, and 278—***that is, a pattern of racketeering activities in furtherance of the unlawful debt collection activities with respect to GX 1-4, and GX 5, the null and void ab initio, unenforceable, uncollectible, and moot criminal usury subject matter.*** See *Adar Bays, LLC v. GeneSYS ID, Inc.*, 28 F.4d 379 (2d Cir. 2022), and *United States v. Grote*, 961 F.3d 105 (2d Cir. 2019) (Aff'd conviction, sentence, and ***+$3.5 billion in RICO forfeiture judgment*** for unlawful debt collection activities).

[4] The Appellees have had *actual and constructive* **notice since 2010** of the possibility of criminal and civil 18 USC § 1964(c) RICO charges arising from KTS and its unregistered broker-dealer clients' suspect and criminal activities, before, during, and after the 03-93031 Chapter 11 proceedings; and according to the current 03-93031 Rule 5003 **purported complete and properly maintained** docket, there is no record of any intervention or appearance in 03-93031 by any Appellee, their privies, agents, proxies, surrogates, alter-egos, ***or all those in active concert therewith*** inquiring of and petitioning the Bankruptcy Court to make a declaratory judgment ruling on ***any potential civil or criminal liability, responsibility, or culpability*** they might face from KTS and its unregistered broker-dealer clients' conducting Hobbs Act 18 USC §§ 2, 152, 157, 371, 401(2), 401(3), 924(c), 1201-02, 1341, 1343, 1344, 1346, 1503, 1512, 1519, 1956-57, 1958-59, 1961(6)(B), 1962(a-d), and 2071(a), (b) unlawful debt collection activities, apropos Dkt. 6, 11, 13, 14, 15, 16, 28, 256, 258, 274, 275, and 278, before, during, and after the 03-93031 proceedings. ***Accordingly, each Appellee has knowingly and willfully forfeited, waived, and abandoned all procedural due process rights in regard to the 03-93031 and 25cv00613 (NDGA) pending appeal***—that is, immediate entry by the 25cv00613 (NDGA) District Court (Brown, J.) of partial final money judgment in the sum certain amount of $5.2225 billion, jointly and severally, ***against each Appellee is required by res judicata*** resulting from Sand, J., Dec. 20, 2007, Dkt. 90, Rule 41(a)(2) voluntary final judgment ***entered in 02cv2219 (SDNY) after the statute of limitation had run on all claims in the 02cv2219 (SDNY) lawsuit.*** *Federated Dept. Stores, Inc.,* 452 U.S. at 398, 401-02.

## IV. FINAL NOTICE AND OPPORTUNITY FOR IMMEDIATE MITIGATION:

This Memorandum serves as Appellants' final and unequivocal Rule 9011 (b)(1-4) and 28 USC § 1927 ***actual and constructive formal notice*** to each Appellee regarding ***the imminent and severe adverse legal (penal) and financial consequences*** of your continued non-response and obstructionist conduct. Appellants extend a final opportunity to each Appellee to mitigate your escalating legal and financial exposure by immediately:

1. Ceasing all further obstructionist conduct and bad faith non-compliance.
2. Providing full and complete compliance with all outstanding mandatory Rule 26(a)(1)(A)(iv) insurance disclosure demands.
3. Formally acknowledging and stipulating to the factual accuracy and completeness of the Joint Stipulated Appellate Record (13-6) (Part 15-6).
4. Initiating good faith settlement discussions with Appellants to explore a mutually agreeable resolution that would avert the necessity of further judicial intervention and the imposition of the severe adverse consequences detailed herein.

## v. APPELLANTS' ACTUAL NOTICE OF ADVERSE CONSEQUENCES.

The Appellees' failure to individually respond immediately, ***not later than 11:00 am, on Monday, February 17, 2025, time is of the essence***, and to demonstrate unequivocal and good faith compliance and a genuine commitment to settlement discussions will be construed as:

(i) a confirmation of your knowing, deliberate, and intentional willful waiver, forfeiture, and abandonment, ***Espinosa***, Id., of all procedural due process,

(ii) a tacit and actual agreed, conceded, stipulated, and factual judicial admission of civil 18 USC § 1964(c) RICO, tort, and criminal liability—11 USC §§ 152, 157, 401(2), 401(3), and 2071(a), (b) to the Appellants in the sum certain amount of $5.2225 billion, plus punitive damages,

costs, fees, expenses, and a reasonable attorneys fee to be determined in damages and sanctioning proceeding in the District Court, Brown, J.

**Such failure will compel Appellants *to immediately file their motion for severance of particular Appellees, pursuant to Rule 9011, 28 USC§ 1927, inherent power sanctions, and entry of partial final judgment in the 25cv00613 (NDGA) (MLB) pending appeal*, seeking the full measure of relief requested, including entry of a money judgment in the sum certain amount of $5.2225 billion, entered against each severed Appellee, jointly and severally, in it or their personal and individual capacity,[5] and criminal referral to the Department of Justice and the Federal Bureau of Investigation.**

Respectfully submitted,

/s/ Ulysses T. Ware

ULYSSES T. WARE

Attorney for Appellants-Movants

Ulysses T. Ware and Group Management

Dated: February 16, 2025

---

[5] Atlanta, GA law firms Kilpatrick, Townsend, & Stockton, LLP, Dennis S. Meir, John W. Mills, III, J. Henry Walker, IV, Wab Kadaba, Nall & Miller, LLP, Patrick Nash Arndt, Michael D. Hostetter, Lawrence B. Mandala, Thomas A. Leghorn, London Fischer, LLP, Robert H. Albaral, Michael J. Malliband, Garland, Samuel, & Loeb, P.C., Manibur S. Arora, Edward T.M. Garland, Baker & McKenzie, LLP, FINRA, the State Bar of Georgia, Mary Ida Townson, Jeneane Treace, James H. Morawetz, Arie Rabinowitz, Kenneth A. Zitter, each 02cv2219 (SDNY) plaintiff, cf., Dkt. 11, 03-93031, John F. King, William D. NeSmith, III, Paula Frederick, Leigh Burgess, William Alan Myers, Jonathan Hewett, Jenny Mittlemen, Wendy L. Hagenau, M. Regina Thomas, Patricia Sinback, and others to be named and identified at a later date.

**Certificate of Service**

I, Ulysses T. Ware, attorney in fact for the Appellants, hereby certify under penalty of perjury that on this 16th day of February, 2025, I caused to be served a true and correct copy of the foregoing **(13-9) (Part 15-9) 02.16.25 re: Appellants' Memorandum of (i) Actual Notice of the 03-93031 (BC NDGA)** *In re Group Management Corp.* **Proceedings, and (ii) Adverse Consequences, civil and penal, for each Appellee named in 25cv00613 (NDGA) (MLB),** including the attached Appellee Service List, see Dkt. 281, infra, (03-93031) via electronic mail to each Appellee's known email address to each Appellee.

/s/ Ulysses T. Ware

Ulysses T. Ware

**Exhibit 1--Dkt. 281—The Bankruptcy Clerk's In re Group Management Corp., 03-93031 (BC NDGA) and 25cv00613(NDGA) (MLB) *Actual Public Notice* to Appellees.**

Case 03-93031-wlh    Doc 281    Filed 02/07/25    Entered 02/07/25 12:35:15    Desc Main
Document    Page 1 of 27

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**

IN RE:

Group Management Corp.

    Debtor(s)

CASE NO. 03-93031-wlh

CHAPTER 11

Ulysses T. Ware and Group Management

    Appellant

v.

Alpha Capital, AG, Stonestreet, L.P., Markham Holdings, L.P., Amro International, S.A., Kilpatrick, Townsend, & Stockton, LLP, Dennis S. Meir, John W. Mills III, a J. Henry Walker, IV, Wab Kadaba, Kenneth A. Zitter, Arie Rabinowitz, LH Financial Services Corp., Konrad Ackermann, Joseph Hammer, Trailblazer Merger Corp., I, Wendy L. Hagenau, James H. Morawetz, the Office of the U.S. Trustee, Region 21, Ida Mae Townsend, M. Regina Thomas, Patricia Sinback, Margaret H. Murphy, Joyce Bihary, Coleman Ray Mullins, Securities and Exchange Commission, Financial Industry Regulatory Agency (FINRA), Barbara Ellis-Munro, Marcia E. Asquith, Robert L.D., Colby, Robert W. Cook, Emma Jones, Sarah Jeffries, The State Bar of Georgia, Office of the General Counsel, William D. NeSmith, III, Paula Fredrick, Leigh Burgess, William Alan Myers, Adrienne Nash, Jenny Mittlemen, Jonathan Hewett, Patrick N. Arndt, Michael D. Hostetter, Nall & Miller, LLP, Manibur S. Arora, Edward T.M. Garland, Michael F. Bachner, David B. Levitt, Donald F. Samuel, Janice Singer, Alexander H. Southwell, Thomas W. Thrash, Jr., Michael P. Boggs, Thomas A. Leghorn, Lawrence B. Mandala, Baker & McKenzie, LLP, Robert H. Albaral, John F. King, and Office of the Georgia Insurance Commissioner., and John Does Insurance Companies, ##1-5.

    Appellees

NOTICE TO APPELLANT AND APPELLEE

RE: NOTICE OF APPEAL FILED ON February 3, 2025

NOTICE IS GIVEN that the Appellant shall, within 14 days of February 3, 2025 the date the appeal was filed, file with the Clerk of the United States Bankruptcy Court the following:

1.    A designation of the items to be included in the record on appeal and serve a copy upon the appellee (include the corresponding docket number for each pleading listed);

2.    A statement of the issues to be presented and serve a copy upon the appellee; and

3.    A written request for the transcript and deliver a copy to the court reporter IF the record designated includes a transcript of any proceeding or a part thereof.

NOTICE IS FURTHER GIVEN that within 14 days after the service of the appellant's statement, the appellee may file and serve on the appellant a designation of additional items to be included in the record on appeal.  Without a designation of the record, the record prepared by the Clerk will consist only of the notice of appeal, the judgment, order or decree appealed from, and any opinion, findings of fact, and conclusions of law of the court (*See* Rule 8009 of the Federal Rules of Bankruptcy Procedure.)

**YOU SHOULD REDACT (REMOVE) PERSONAL INFORMATION from the documents and exhibits in the Designated Record.  Include only the last four digits of any Social Security number, taxpayer-identification number, or financial account number.  Include only an individual's year of birth or the initials of a minor child** (*See* Rule 9037 of the Federal Rules of Bankruptcy Procedure.)

VANIA S. ALLEN, CLERK

By: /s/ _____
      Yahaira Lugo, Deputy Clerk

(13-9) (Part 15-9) re Appellants' Final Actual Notice of Adverse Consequences, civil and penal, for each Appellee, their privies, agents, proxies, surrogates, alter-egos, and all those in active concert therewith.

**Exhibit 2—GA OIC's Regulatory finding of bad faith violation of GA statutory insurance law by KTS, GSL, and Nall & Miller, LLP**

 **Office of Commissioner of Insurance and Safety Fire**
Protect | Enforce | Educate | Inform

**JOHN F. KING**
*Commissioner of Insurance and Safety Fire*

Two Martin Luther King Jr. Drive
West Tower, Suite 702
Atlanta, Georgia 30334

November 15, 2024

Mr. Ulysses Thomas Ware
123 Linden Blvd Apt 9L
Apt 9L
Brooklyn, NY 11226

RE:    Our Case Number:    555289371

Dear Mr. Ware:

The Consumer Services Division is the investigative arm of the Office of Commissioner of Insurance and attempts to ensure fair and equitable dealings between insurers, agents, policyholders, and 3rd party claimants regarding all insurance transactions. This division receives complaints against agents, insurers, various contractors, vendors, and unlicensed individuals.

To address the matter concerning O.C.G.A 33-3-28 (a) 2. This statute requires the insured to disclose the name of each known insurer which may be liable to the claimant within 30 days of receiving a written request. Given the insureds' failure to comply with the statutory requirement, we suggest this matter is now a matter of the courts.

We do appreciate the confidence you placed in the Office of Insurance Commissioner John F. King.

Sincerely,

*Jessica Dozier*

Complaints Analyst
Consumer Services Division
Phone: 404-656-9135; Fax: 404-657-8542

/ JD

Sunday, February 16, 2025
(13-9) (Part 15-9) re Appellants' Final Actual Notice of Adverse Consequences, civil and penal, for each Appellee, their privies, agents, proxies, surrogates, alter-egos, and all those in active concert therewith.

# Exhibit 3—GA OIC's notice of criminal investigation of conspiracy to commit insurance fraud by KTS, GSL, and Nall & Miller, LLP

 Gmail

Ulysses Ware <utware007@gmail.com>

**Mail-In Complaint Confirmation**
1 message

DeLaremore, Anya <ADeLaremore@oci.ga.gov>                      Mon, Oct 21, 2024 at 11:15 AM
To: "Utware007@gmail.com" <Utware007@gmail.com>

Good Morning Ulysses,

The OCI Consumer Services division received your mailed-in complaint and forwarded it to our division. Your CID file number is 2024-00000483. Before we will open an investigation, one of our supervisors must review the information you provided. He or she will make the final decision.

Thank you!

Anya DeLaremore

*Business Support Analyst*

Criminal Investigations

Office of Commissioner John F. King

Two Martin Luther King Jr Drive

Suite 720 West Tower

Atlanta, Georgia 30334

ADelaremore@oci.ga.gov

404-651-6891

(13-9) (Part 15-9) re Appellants' Final Actual Notice of Adverse Consequences, civil and penal, for each Appellee, their privies, agents, proxies, surrogates, alter-egos, and all those in active concert therewith.

Thank you for your attention to this critically important Article III "threshold" jurisdiction and standing constitutional matter.

**RESPECTFULLY SUBMITTED,**

**For Appellants: GROUP MANAGEMENT and Ulysses T. Ware**

/s/ Ulysses T. Ware

**Submitted by:**
**/s/ Ulysses T. Ware**
**The Office of Ulysses T. Ware**
123 Linden Blvd., Ste 9-L
Brooklyn, NY 11226
(718) 844-1260
**Utware007@gmail.com**
February 16, 2025


**For Appellants-Movants Ulysses T. Ware and Group Management and Appellees:**

cc: U.S. Court of Appeals for the Eleventh Circuit, Office of the Judicial Council

Administrative Office of the U.S. Courts, Executive Director

Office of the U.S. Trustee, Region 21, (Mary Ida Townson, Esq.)

Financial Industry Regulatory Agency (FINRA) on behalf of the Securities and Exchange Commission (Marcia E. Asquith, Esq.)

State Bar of Georgia, Office of the General Counsel (William D. NeSmith, III) on behalf of the Supreme Court of Georgia, Office of the Chief Justice, the Hon. Michael P. Boggs

Edward T.M. Garland on behalf of Garland, Samuel, & Loeb, P.C. and affiliates

Nall & Miller, LLP

Kilpatrick, Townsend, & Stockton, LLP on behalf of its clients, the 02cv2219 (SDNY) plaintiffs, Unregistered broker-dealers Arie Rabinowitz on behalf of LH Financial Services Corp., Trailblazer Merger Corp., I

Unregistered broker-dealers Frank V. Sica on behalf of Tailwind Management L.P., Colleen McMahon, and Michael S. Bertisch (see Ex. 10)

# Certificate of Service

I Ulysses T. Ware certify that I have this 16th  day of February 2025 served each of the below

persons or entities with a copy of this pleading via their public email accounts and submitted the

same to the U.S. Bankruptcy Court (NDGA) to the Chief Bankruptcy Judge, Ellis-Monro via the

for immediate filing and docketing pursuant to 18 USC §§ 2071(a), (b), Bankr. Rule 5003,

5005(a)(2)[6] and 5005(b)(1) with the U.S. Trustee.[7]


cc:    Office of the U.S. Trustee, Region 21 (Mary Ida Townson)
       Baker & McKenzie, LLP attn. Michael J. Malliband, Esq. (Managing Partner)

       U.S. Court of Appeals for the Eleventh Circuit, Office of the Judicial Council

       Kilpatrick, Townsend, & Stockton, LLP (via CEO Wab Kadaba, Esq., J. Henry
       Walker,  IV, Dennis S. Meir, and John W. Mills, III)

       Arie Rabinowitz, Kenneth A. Zitter, Alpha Capital, AG, Stonestreet, L.P.
       Markham Holdings, Ltd., AMRO International, S.A., Trailblazer Merger Corp,
       I, LH Financial Services Corp., convicted felon Edward M. Grushko, Joseph
       Hammer, and Barbara R. Mittman via Kilpatrick, Townsend, Stockton, LLP
       (Wab Kadaba, Esq. and J. Henry Walker, IV).

       Baker & McKenzie, LLP (via Michael J. Malliband, Esq., Lawrance B. Mandala,
       Esq., Robert Albaral, Esq. and Thomas A. Leghorn, Esq.)[8]

---

[6] *With a Judge of the Court.* A judge may personally accept for filing a paper listed in (1). The judge must
note on it the date of filing and promptly send it to the clerk.

[7] **(b) Sending Copies to the United States Trustee.**
(1) *Papers Sent Electronically.* All papers required to be sent to the United States trustee may be sent by
using the court's electronic-filing system in accordance with Rule 9036, unless a court order or local rule
provides otherwise.

[8] **Baker & McKenzie, LLP has primary liability in the sum certain amount of $2.225 billion.**

Page **21 of 23**
Sunday, February 16, 2025
(13-9) (Part 15-9) re Appellants' Final Actual Notice of Adverse Consequences, civil and penal, for each
Appellee, their privies, agents, proxies, surrogates, alter-egos, and all those in active concert therewith.

William D. NeSmith, III, State Bar of Georgia; Office of the Chief Justice, Supreme Court of Georgia, the Hon. Michael P. Boggs (via Paula Fredrick and William D. NeSmith, III--statutory agents in fact); and

John F. King, Georgia Insurance Commissioner on behalf of (undisclosed identities) John Doe Insurance Companies ##1-5 (via William D. NeSmith, III, Wab Kadaba, J. Henry Walker, III, Michael D. Hostetter, Edward T.M. Garland, the State Bar of Georgia, Office of the General Counsel, and Wendy L. Hagenau, statutory agents in fact);

FINRA (via Robert W. Cook, Robert L.D. Colby, Sarah Jeffries, and Marcia E. Asquith) on behalf of the Securities and Exchange Commission (11 USC 1109(a) statutory party in interest); and

## Acting Director of the FBI (via Mary Ida Townson, Esq., U.S. Trustee, Region 21)

/s/ Ulysses T. Ware

**February 16, 2025**

## Certificate of Service—John F. King

I, Ulysses T. Ware, hereby certify that on this 16th day of February 2025, I caused to be served a true and correct copy of the foregoing **IMMEDIATE DEMAND FOR DISCLOSURE AND PRODUCTION OF REGULATORY IDENTIFYING INFORMATION REGARDING "JOHN DOE INSURANCE COMPANIES ##1-5" PURSUANT TO OCGA § 33-3-28(a)(1), (2) AND FED. R. CIV. P. RULE 26(a)(1)(A)(iv) IN** *IN RE: GROUP MANAGEMENT CORP.*

via electronic mail to Anya DeLaremore at ADelaremore@oci.ga.gov and by U.S. Mail, first-class

postage prepaid, to Insurance Commissioner John F. King, Office of the Georgia Insurance Commissioner, Two Martin Luther King Jr. Drive, Suite 720 West Tower, Atlanta, Georgia 30334.

/s/ Ulysses T. Ware

*Ulysses T. Ware*

Ulysses T. Ware

# End of document

# 03-93031: Rule 8009(d) F-8

**United States District Court**
**Southern District of New York**

─────────────────────────────── x

Alpha Capital Aktiengesellschaft, Amro
International, S.A., Markham Holdings, Ltd.,
and Stonestreet Limited Partnership,

02 CV 2219
Judge Sand

Plaintiffs,

-against-

**DECLARATION**

Group Management Corp., formerly known
as IVG Group, formerly known as Internet
Venture Group, Inc., Elorian Landers and
Becky Landers,

Defendants.

─────────────────────────────── x

Confessions, binding judicial admissions, and self-incrimination by
Lawrence B. Mandala, Esq. and Baker & McKenzie, LLP.

### DECLARATION OF LAWRENCE B. MANDALA

I, Lawrence B. Mandala, declare as follows:

1.     I am a licensed attorney with the law firm of Baker & McKenzie in its

Dallas, Texas office. I am over 18 years of age and file this declaration on behalf of

Group Management Corp., formerly IVG Corp. ("Group Management" or "the

Company"), in opposition to plaintiff's motion for preliminary injunctive relief.

2.     From on or about October 2000 through January 2002, I provided legal

services to the Company in connection with the negotiation of financing and the

preparation and filing of a registration statement with the United States Securities and

Exchange Commission ("SEC") on form SB-2.

445726-1                                      1

GX 1 and GX 5 null and void ab initio for violations of 15 USC 78o(a)
(1) and 78cc(b); and 18 USC 1951(a), 1961(6)(B), and 1962(a-d).

### The Financing and Subscription Agreement

3.    In January and February 2001, I provided legal services for the Company

in connection with a transaction with the plaintiffs in this case. The transaction closed on

GX 5

February 2, 2001, and involved, among other things, the sale pursuant to a Subscription

Predatory criminal usury unlawful debts, GX 1-4

Agreement of a total of $1.1 million of convertible notes by the Company to the

plaintiffs. A copy of the Subscription Agreement is attached as Attachment A. In

addition, the plaintiffs and Union Atlantic Capital, L.C., a financial advisor involved in

the transaction, received warrants to purchase common stock of the Company.

GX 5, para. 10.1(iv): Section 2(a)(11) statutory underwriter
status of KTS' clients admission by Baker and Mandala.

4.    The Subscription Agreement stated that the registration statement was to

be filed within 90 days of the closing of the transaction (by May 3, 2001) and effective

within 135 days of the closing of the transaction (by June 17, 2001). From February

2001 through January 2002, I worked diligently on behalf of the Company with both the

Company and its independent accountants to prepare, file and amend a registration

statement acceptable to the Company, and which the Securities and Exchange

Commission (the "SEC") would make effective, to register the shares of the Company's

common stock issuable upon conversion of the notes and exercise of the warrants.

5.    Throughout the registration process, I kept Edward Grushko, counsel for

the plaintiff noteholders, and Andrew Reckles, representative of Union Atlantic Capital,

L.C., apprised of the registration process.

### SB-2 Registration Statement

6.    Between February 2001 and May 2001, I worked with the Company and

its independent accountants to prepare the registration statement for filing. The

Mandala's confessions and binding judicial admissions of 15 USC
77b(a)(1) statutory underwriter status for each of KTS' unregistered
broker-dealer clients, see Dkt. 11, 03-93031, which rendered KTS and
its clients, and Baker & McKenzie, and Mandala jointly and severally
liable for +$5.2225 billion in damages.

CS CamScanner

Baker & McKenzie and Mandala confessed and judicially admitted, equitable estoppel, that GX 1-4 violated NYS Penal Law, section 190.40, the criminal usury law, a class E felony, and implicitly admitted the UST's, Dkt. 6, and 13, and KTS' Dkt. 11, 15, and 16 violated 18 USC 151(a), 1961(6)(B), and 1962(a-d); as well as, Hagenau's 256 to 275, and Ellis-Monro's 278 and 286.

registration statement was filed with the SEC on May 2, 2001, within the time periods

stated in the Subscription Agreement.

7.    When the registration statement was filed, the Company sought to register

for the noteholders and Union Atlantic Capital, L.C., the offer and sale of 2,724,546

shares of the Company's common stock. This number included (a) 2,121,504 shares that

represented 200% of the shares of common stock that would have been issuable to the

noteholders on conversion of the notes, if they had been converted on May 2, 2001, plus

(b) 278,042 shares that represented 200% of the shares that would be issuable to the

noteholders under the Subscription Agreement 180 days after the registration statement

became effective, if the Company's closing bid price did not exceed $2.374 for 10

consecutive trading days during that 180-day period and the Company's average closing

price for the five days at the end of such 180-day period did not exceed $1.5825, plus (c)

325,000 shares that represented 100% of the shares issuable to the investors and Union

Atlantic Capital, L.C. upon exercise of the warrants they were issued under the

Subscription Agreement.

8.    On April 1, 2001, the Company acquired SES-Corp., Inc. ("SES") in a

merger. As a result of the merger, financial information about SES, including historical

audited and unaudited financial statements and pro forma financial information giving

effect to the merger, was required under SEC rules to be included in the registration

statement.

9.    On June 8, 2001, I received a comment letter from the SEC relating to the

registration statement. I promptly telephoned Edward Grushko, counsel for the

CS  CamScanner

noteholders, advised him that the comment letter had been received, and forwarded a copy of the SEC's comment letter to him.    null and void GX 5

10.    Although the Subscription Agreement called for the registration statement to be declared effective by June 17, 2001, the Company was unable to do so. The historical audited and unaudited financial statements of SES that needed to be included in the registration statement were never provided to the Company. Without these financial statements, the Company could also not prepare the required pro forma financial information for the registration statement.

11.    Throughout June and July 2001, I advised both Mr. Grushko and Mr. Reckles of the Company's efforts to obtain, and eventual inability to obtain, the SES financial information necessary to complete an amendment to the registration statement.

12.    During July and August 2001, I was asked by the Company to prepare documents essentially unwinding the merger with SES by selling the stock of SES to the two former owners of SES. This sale occurred on or about August 14, 2001.

13.    So that the Company could proceed with the registration statement, I spoke with the Staff of the SEC's Division of Corporation Finance in August 2001 and obtained their informal advice that the Company could, upon the disposition of SES by the Company, proceed with the registration statement and its other SEC filings, but omit the financial information regarding SES that would normally have been required to be included.

14.    During July and August 2001, I participated in conversations with Mr. Grushko and Mr. Reckles regarding the possibility that the noteholders would provide the

Company with additional financing, and extend the time period for the Company to file an amendment to the registration statement and make the registration statement effective.

Agreement to Extend Date by which Registration Statement was to be Declared Effective

15.    On or about September 10, 2001, pursuant to the terms of a Security Agreement and Collateral Agent Agreement, copies of which are attached as Attachments B and C, the parties agreed that Group Management would be given an extension to December 10, 2001 within which to have the registration statement declared effective by the SEC. The Security Agreement also called for the Company to file Amendment No. 1 to the registration statement by October 10, 2001.

16.    In addition, the noteholders provided an additional $55,000 to the Company for the purpose of paying some of the legal and accounting fees due to counsel and accountants working on the registration statement.

17.    Under the Security Agreement, several of the Company's shareholders pledged a total of 5,003,000 shares of the Company's common stock owned by them, as security for the Company's obligations to the noteholders under the convertible notes and the loans described in the immediately preceding paragraph of this Declaration.

18.    Between June and October 2001, I worked with the Company and its independent accountants to prepare Amendment No. 1 to the registration statement for filing. The amendment was filed with the SEC on October 10, 2001, within the time periods stated in the Security Agreement.

19.    When Amendment No. 1 to the registration statement was filed, the Company sought to register for the noteholders and Union Atlantic Capital, L.C., the offer and sale of 39,233,420 shares of the Company's common stock. This number

445726-1                                    5

Baker's and Mandala's confession of aiding and abetting 18 USC 2, 371, 1951(a), 1961(6)(B), and 1962(a-d) unlawful debt collection activity.

CS CamScanner

$2.374 x 38,630,378 = $91,708,517.37 plus interest to be disgorged to the Chapter 11 estate as a result of Baker & McKenzie's negligence and fraud--subject to Rule 26(a)(1)(A)(iv) insurance policy disclosure for claims by the Appellants.

included 38,630,378 shares that represented 200% of the shares that would have been issuable to the noteholders on conversion of the notes, if they had been converted on October 8, 2001, plus (b) 278,042 shares that represented 200% of the shares that would be issuable to the noteholders under the Subscription Agreement 180 days after the registration statement became effective, if the Company's closing bid price did not exceed $2.374 for 10 consecutive trading days during that 180-day period and the Company's average closing price for the five days at the end of such 180-day period did not exceed $1.5825, plus (c) 325,000 shares that represented 100% of the shares issuable to the investors and Union Atlantic Capital, L.C. upon exercise of the warrants they were issued under the Subscription Agreement.

<u>SEC Comment Letter</u>

20.   On or about November 16, 2001, almost five weeks later, the SEC provided its written comments on Amendment No. 1, a copy of which is attached as Attachment D.  I promptly telephoned Edward Grushko, counsel for the noteholders, advised him that the comment letter had been received, and forwarded a copy of the SEC's comment letter to him.

## The binding regulatory smoking gun

21.   Comment number 2 noted that the Company was registering for resale 39 million shares owned by parties that "may be deemed affiliates" of the Company "because of their holdings and because of the subscription and security agreements in effect involving them."  The SEC Staff took the position that the registration of such a large number of shares by "related parties" should be deemed the same as a registration by the Company.  The Staff also took the position that registration of these shares for resale in the manner proposed by the noteholders (an "at the market" shelf registration)

"May be deemed affiliates" ==> that the SEC's staff in a binding regulatory determination ruled that KTS' unregistered broker-dealer clients were in fact 15 USC 78p(b) statutory insiders, "affiliates" of the Chapter 11 Debtor Group Management, and therefore are required to disgorge, 11 USC 542(a) turnover to the Chapter 11 estate the $91,708,517.37 jointly and severally with Baker & McKenzie, KTS, Mandala, KTS' clients, Meir, Mills, Walker, Kadaba, and the U.S. Trustee, James H. Morawetz.

CS CamScanner

was not permissible because the Company did not meet the requirements to do an at the market shelf registration for itself.

22.     Comment 16 of the SEC's letter requested that the holdings of beneficial owners over 5% in the registration statement be revised to reflect the ownership of the plaintiff noteholders and that the Company disclose the "control persons" of the plaintiff noteholders.

23.     On November 21, 2001, I spoke with Edward Grushko regarding the information requested by the SEC regarding the plaintiff noteholders' status as affiliates of the Company and the names of their control persons. Only the noteholders or their counsel could provide the factual information regarding the noteholders and their relationships with the Company and with each other that was necessary to provide a full and accurate response to Comments 2 and 16.

24.     On November 27, 2001, I again requested that Mr. Grushko provide the information the Company needed from the noteholders in order to respond to Comments 2 and 16. [See Attachment E.] On December 4, 2001, I received a copy of an e-mail from Clay Border of Group Management to a representative for one of the investors, again requesting this information. [See Attachment F.]

25.     On December 6, 2001, I received a fax containing representations from two of the four noteholders regarding their affiliate status. [See Attachment G.] I advised Mr. Grushko both by telephone and e-mail that we still needed comparable information regarding the other noteholders, and that we still needed information regarding the control persons of all four noteholders in order to respond to Comments 2 and 16. [See Attachment H.]

26.    On December 7, 2001, I received a fax containing representations from the other two noteholders regarding their affiliate status. [See Attachment I.]

27.    On December 10, 2001, I received three e-mails from counsel for the noteholders who for the first time provided the names of persons they represented were the control persons of the noteholders and representing that certain other persons were not control persons of the noteholders. [See Attachment J.]

28.    Even though the parties to the Security Agreement had agreed that the registration statement was to be declared effective by December 10, 2001, the plaintiff noteholders did not supply the full information the Company needed to respond to Comments 2 and 16 until December 10, 2001 at 8:49 a.m., 10:07 a.m. and 2:49 p.m. on that date.

29.    Based upon the information provided by the noteholders on December 6, 7 and 10, I prepared a letter to the SEC requesting that they waive Comment 2 and permit the resale "at the market" shelf registration by the noteholders to go forward.  This letter was sent to the Staff on December 19, 2001.  In late December or early January, the SEC Staff advised me that they would withdraw Comment 2.

30.    Between November 2001 and January 2002, I worked diligently with the Company and its independent accountants to prepare or obtain the information necessary to prepare a second amendment to the registration statement that responded to the SEC's November 16 comment letter.

An Effective Registration Statement

31.    An amended  registration statement responding to the SEC's November 16, 2001 comment letter could be prepared and filed on behalf of the Company to

effect the registration on behalf of the plaintiff noteholders.  However, due to the passage

of time, the financial information and other disclosures in the registration statement needs

to be updated, and certain additional financial information regarding CyberCoupons, Inc.,

a 35%-owned subsidiary of the Company, and Swan Magnetics, Inc., a former subsidiary

of the Company, must be obtained.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 15, 2002

Lawrence B. Mandala

# 03-93031: Rule 8009(d) F-9

**United States District Court**
**Southern District of New York**
————————————————————x

Alpha Capital Aktiengesellschaft, Amro
International, S.A., Markham Holdings, Ltd.,
and Stonestreet Limited Partnership,

                Plaintiffs,

   -against-

Group Management Corp., formerly known
as IVG Group, formerly known as Internet
Venture Group, Inc., Elorian Landers and
Becky Landers,

                Defendants.

————————————————————x

02 CV 2219
Judge Sand

**DECLARATION**

## DECLARATION OF ELORIAN LANDERS

    I, Elorian Landers, declare as follows:

1.    I am the Chief Executive Officer ("CEO") of Group Management Corp,

formerly IVG Corp, and I am over 18 years of age. I am submitting this declaration in

opposition to plaintiff's motion for a preliminary injunction.

2.    Group Management ("GPMT" or "the Company") is a holding company

engaged in consolidating human resource companies, such as temporary staffing, project

staffing, and human resource consulting. GPMT also owns a small promotion and gift

manufacturer named GeeWhiz.

446951-1                              1

 CamScanner

## Negotiations Over $1.3 Million Convertible Financing

3.    In October 2000, Vince Sbarra, Senior Vice President of investment banking and marketing for Union Atlantic Capital, L.C., an investment banking firm, provided a term sheet to me, as GPMT's CEO, for proposed financing of $3 million based on the issuance of convertible securities. [Attachment A.]. Over the next several months, Andrew Reckles ("Reckles"), the CEO of Union Atlantic, served as the main contact person with whom we negotiated the financing. The October 2000 term sheet required the Company only to use its "best efforts" in filing and accelerating the effective date of a registration statement within 180 days of the closing date of the financing [see Attachment A]; but, the pertinent filing and effective dates for the registration statement were changed in the subscription agreement. [See ¶ 6  below.]

4.    Four offshore investors/lenders, through Reckles,  would supply the funding, which in the aggregate totaled $1.1 million and their interests would be represented by convertible securities.  The names, country of origin, dollar amount of investment, and contact person are listed below:

(a)    Alpha Capital Aktingesellschaft

   Lichtenstein
   $300,000
   Contact person:  Ari Rabinowtz, who owns LH Financial

(b)    Amro International S.A.
   Zurich, Switzerland
   $250,000
   Contact person: Thomas Badian

(c)    Markham Holdings LTD
   Gibraltar
   $350,000
   Contact Person: David Hassan

Unregistered broker-dealers, KTS' clients in 03-93031, Dkt. 11, 15, and 16

446951-1

CS CamScanner

(d)    Stonestreet Limited Partnership
       Markham, Ontario
       $200,000
       Contact person: Michael Finkelstein

5.     Closing on the financing occurred on February 2, 2001. At that time,

each of the above investors were issued a convertible note.

6.     The subscription agreement for this financing stated in paragraph 10.1(iv)

that the Company was to undertake *reasonable commercial efforts* to get a registration

statement filed and declared effective:  15 USC 77b(a)(11) statutory underwriter
status.

       "The Company shall file with the [Securities and Exchange] Commission
       within 90 days of the closing date (the "Filing Date") and use its
       *reasonable commercial efforts* to cause to be declared effective a Form
       SB-2 registration statement (or other form that it is eligible to use) within
       135 days of the Closing Date in order to register the Registrable Securities
       for resale and distribution under the Act." [See Attachment A to the
       Declaration of Lawrence Mandala, ¶10.1(iv)(emphasis added).]

7.     This time table required the filing of a registration statement by May 3,

2001, and required that the registration statement be declared effective by June 15, 2001.

8.     As CEO, from early March 2001 to the present, I and the other officers of

the Company have worked tirelessly to get a registration statement on Form SB-2 filed

and to have it declared effective by the Securities and Exchange Commission ("SEC")

pursuant to the subscription agreement. The Company retained highly competent

Lawrence B. Mandala, Esq.--a complete fraud and incompetent.
securities lawyers (Baker & McKenzie) as well as full-time accountants, and I directed

my fellow officers and the Company's directors to be responsive in a timely fashion to

any and all inquiries by counsel and our accountant. However, the ultimate decision

maker as to the effectiveness of a registration statement is the SEC, not the Company.

CS CamScanner

9.     During the period March through June 2001, I and other officers of the Company kept the plaintiff noteholders and their representatives fully apprised of any issues that arose and any possible changes in the time table encountered in getting the registration statement ready for filing with the SEC.  During the spring and summer months, no one ever objected to any slippage in the time schedule.

10.     Further, from June 2001 to the present, the Company's other officers, employees and I  have remained with the Company without salary payments, despite the problems we have encountered,  because we have sought to take all possible corrective action and protect the interests of over 600 shareholders.

**Acquisition of SES-Corp, Inc.**

11.     On or about April 1, 2001, by merger, the Company acquired SES-Corp, Inc. and its subsidiary SES, which was a professional employment organization. Although we had been provided with financial statements by SES during the due diligence process, SES's management promised our CFO, Pat Walden, that SES would provide audited financial statements within 60 days or less of the closing on the acquisition.

Baker & McKenzie, LLP 18 USC 1964(c), 1961(6)(B) civil liablity for +$5.2225 billion.

12.     The Company's securities counsel, Lawrence Mandala, and I kept the investors representatives,  including Andrew Reckles, as well as their legal counsel, Edward Grushko, fully informed of the status of the SES acquisition and the need for historical audited and pro forma financial statements for inclusion in the Company's SB-2 registration statement.

13.     None of the investors or their representatives ever objected to the impact on the time table caused by the lack of these financial statements for SES.  Indeed, the

CS CamScanner

investors were excited about the acquisition of SES because such an acquisition added value to the Company. SES' annual revenue approximated $989 million. Thus, the Company and the investors representatives continued to target late May or early June 2001 as the filing date for the SB-2 registration statement.

## Filing of an SB-2 Registration Statement with the SEC

14.     The SB-2 was filed on or about May 2, 2001, which was within the original schedule set by the subscription agreement.

15.     On June 8, 2001, Lawrence Mandala, the Company's securities counsel, received the first SEC comment letter on the registration statement . The SEC raised the issue of the absence of historical audited financial statements of SES. According to the SEC, without such financial statements, the Company's registration statement could not be declared effective.

## IRS Seizure, Asset Freeze of SES Accounts and SES's Bankruptcy

16.     On April 27, 2001, the Internal Revenue Service executed a search warrant at SES' corporate headquarters as part of an investigation into SES' tax reporting. The IRS removed numerous boxes of SES financial information. [See Attachment B.]

17.     On or about June 26, 2001, I was notified by SES management that Michigan National Bank had frozen SES's bank accounts, because SES held an overdraft at the bank of more than $32 million. [See Attachment C.] By July 2, 2001, the board of directors of SES had determined that SES had to file for bankruptcy. SES has not yet emerged from bankruptcy.

18.    On or about July 10, 2001, the Company announced the failure of SES. [See Attachment D.]

19.    I successfully negotiated with SES to unwind the acquisition and instructed securities counsel to prepare the documents needed to unwind the merger by selling the stock of SES to former owners of SES. This dissolution was publicly disclosed in an 8-K filing with the SEC.

20.    Although I am not certain, I believe that Michigan National Bank contacted the FBI in connection with the freezing of these accounts. On August 1, 2001, an Assistant United States Attorney, Richard Convertino, and two FBI agents, from the Eastern District of Michigan's Organized Crime Unit visited our Company and informed me that the Company had been defrauded by SES in connection with the acquisition. Based on the information from the FBI, I concluded that there was simply no way to obtain audited financial statements for SES.

21.    In late August 2001 or early September 2001, the SEC notified securities counsel for the Company that the it could continue to file its quarterly reports as if the acquisition never occurred.   The SEC reached this determination, notwithstanding the collapse of SES, because the Company held SES for a short time, the board of directors of both companies approved the unwinding of the transaction, and the impossibility of obtaining audited financial statements.

**Extension of Time to Have Registration Statement Declared Effective**

22.    During  August and September 2001, I requested Clay Border, VP of Corporate Development for the Company, to negotiate with the representatives of the investors, including Ari Rabinowitz, Michael Finkelstein and Thomas Badian, as well as

with Andrew Reckles and Paul Mannion, who had left Union Atlantic to form a company

called Hyperion, for an extension of the time to have the registration statement declared

effective. unlawful debt extortion, Hobbs Act, 18 USC 2, 371, 1951(a) violations

23.    Instead of working in the Company's best interests, Reckles and Paul

Mannion refused to discuss an extension with the noteholders unless the Company first

gave them 1.2 million free-trading shares under yet another consulting agreement.

Reckles make it clear that if the Company did not provide the shares and enter into the

consulting agreement, he would simply instruct the noteholders to foreclose on the

original convertible notes.  Ultimately, the Company issued Reckles and Mannion

600,000 shares to act as a consultant. Each of the representatives of the investors --

Badian, Rabinowitz and Finkelstein -- knew about this agreement.

24.    The extension was reflected in a Security Agreement, dated September 10,

2001, in which the Company was granted an extension until December 10, 2001 to have

the registration statement declared effective.

25.    As part of this agreement, plaintiff noteholders stated that they wanted 5

million shares put in escrow,  which represented a sufficient quantity of stock to retire the

$1 million loan when the stock was trading at 20 to 35 cents.  My wife and I placed 3

million shares of the total 5 million shares held in escrow because  the Company was

unable to locate enough additional shareholders to reach the 5 million share requirement.

26.    Amendment Number 1 to the SEC registration statement was filed on

October 10, 2001, two months before the agreed upon date for effectiveness.

**SEC November 2001 Comment Letter**

27. On November 16, 2001, the SEC issued its comment letter on the Company's amended registration statement.

28. Pursuant to comments 2 and 16 in the SEC letter, plaintiff noteholders were required to demonstrate that they were not related parties or affiliates. This required them to disclose the number of shares each held and the identity of the person or entity who controlled them. On or about November 19, 2001, I notified Ari Rabinowitz (LH Financial) that the Company would not be able to proceed any further with the registration statement until the Company was supplied with the underlying information requested by the SEC. I also instructed our securities counsel to notify the plaintiffs counsel, Edward Grushko.

29. Plaintiffs never provided the necessary information until December 10, 2001, the date on which the parties had agreed that the registration had to be declared effective by the SEC. However, given the plaintiffs' tardiness in providing the information, it was impossible to have the registration statement corrected, filed, reviewed by the SEC staff (which itself takes 30 to 45 days) and declared effective -- all on the same day.

30. Further, certain of the information provided by the plaintiffs did not comport with previous information they had supplied to the Company. As an example, based on prior documentation, the Company thought that Ari Rabinowitz was the person who controlled Alpha Capital, one of the plaintiffs. Based on the information provided on December 10, 2001, however, we now were informed that the control person was Konrad Ackerman.

15 USC 78p(b) statutory insider, a fiduciary, of the Chapter 11 Debtor, required to disgorge, 11 USC 542(a) turnover all profits realized from trading in the Debto's equity securities.

31.    Further, it was not until January 2002 that one of the newly disclosed individuals (Konrad Ackerman) actually filed with the SEC beneficial ownership statements on Schedule 13G which revealed the substantial size of his holdings 6.8 million shares in the Company's shares. [See Attachment E.] Most significantly, the number of shares indicated on that Schedule 13G exceeded the total number of shares issued and outstanding by the Company, which at that time was only 3.5 million

**Indication of Market Manipulation**

32.    During the time period of the financial relationship between the Company and the plaintiff investors, I believe that these investors and/or their representatives have engaged in various manipulative tactics to apply downward price pressure on the Company's stock. Although this conduct was present earlier in the year, by September 2001, it became increasingly obvious that the market for the Company's stock was being manipulated. No matter how many shares a purchaser sought to buy, the stock price dropped. There was also a large spread between the bid and asked prices. Further, there were always the same two or three market makers that sat at the top of the market that blocked or discouraged other market makers from participating. Richard Twardowski and I received a number of calls from investors who complained about the downward pressure applied to the stock price, even when they were buying the stock.

33.    After the Company supplied the 600,000 shares to Hyperion for investment advice, there was added downward pressure applied to the stock's price. [See ¶ 23 above.]

34.    In early January 2002, Michael Finkelstein called Clay Border, who

446951-1

9

referred the phone call to my office, and I placed it on the speaker phone. One of the topics of the conversation was market manipulation of the Company's stock. Finkelstein is resident of Canada and associated with Canaccord as an investment advisor. Canaccord is known to use Frankel for its trading. I asked Finkelstein to quit shorting the Company's stock, which Finkelstein denied. I then asked Finkelstein to contact Frankel's head trader to ask them to stop shorting the stock. After Finkelstein first denied knowing anyone at Frankel, Finkelstein acknowledged that he knew the head trader and would contact Frankel to stop the shorting.

35.    In January 2002, following a 20-for-1 reverse stock split, the stock started to trade more normally. However, on at least three occasions, there appeared a large spread between the bid and asked prices — for example, when bid price was 35 cents, but the asked price remained $1.30 or more.

36.    Within the twenty-two day period required by the conversion price formula, which time period encompassed these anomalous bid quotations, the Company was notified that the plaintiff noteholders wanted the 5 million pre-split shares (250,000 post-split shares) held in escrow to be released at a price of 29 cents (85% of the 35 cent bid price under the price formula). [See Attachment F.] I discussed this matter with Ari Rabinowitz on or before February 5, 2002 [See Attachment G.]  When I informed plaintiffs' securities counsel, Edward Grushko, ~convicted felon~ in early February 5, 2002 that these bids constituted pricing irregularities and anomalies, Grushko agreed. Grushko and I discussed assigning a value of 85 cents to the stock, a price which more accurately reflected the true market for the stock, as well as requiring the sale of the stock by plaintiffs on an limited market volume basis and prohibiting short sales. Grushko

reported back on February 7, 2002, however, that his clients refused both the price and the conditions.

37.    Because the Company had informed the SEC, NASD and FBI of possible market manipulation in the Company's stock (See ¶ 38-41 below), I informed Grushko that the Company would not provide an opinion of counsel that the escrow shares could be released at the 29 cents price demanded by the plaintiff noteholders.

**Notification to FBI of Possible Market Manipulation**

38.    On or about February 4, 2002, I contacted an FBI agent, Terrance Donahue, in Houston, Texas and informed him that there was possible stock manipulation occurring in the Company's common stock. He advised us to notify the plaintiff noteholders that they were under preliminary investigation and also advised us not to provide any shares to the plaintiff noteholders.

39.    On February 5, 2002, I also instructed both Clay Border, VP of Corporate Development, and Richard Twardowski, who is in charge of investor relations at the Company, to make a written submission to the NASD.

40.    On February 13, 2002, the Company publicly announced that it had notified the FBI about "possible improprieties in the trading of its stock." It also announced that it had requested the SEC and the NASD to investigate possible anomalies in the quoted bid price of its stock prior to receipt of notices to convert. [See Attachment H.]

41.    Further, Michael Bradle, a business consultant and a shareholder of the Company, contacted me, informed me he wrote to the SEC complaining of stock manipulation, and provided me with a copy of that letter. [See Attachment I.]

446951-1                                        11

42.    On or about April 9, 2002, the SEC contacted the Company that it had commenced a preliminary inquiry into the trading activities in the Company's stock.

**Notice to Convert by Alpha Capital**

43.    On or about February 21, 2002, the Company received a notice from Ari Kluger, an unknown person, on behalf of Alpha Capital of its desire to convert $10,000 principal amount of the convertible note plus interest into 20,066 shares of common stock. [See Attachment J]    *18 USC 1961(6)(B) unlawful debt collection activity.*

44.    I found this notice surprising for several reasons: I did not recognize the name Ari Kluger; the notice involved a small amount; and, there was no underlying stock registered with the SEC into which the note could be converted.    While we were contemplating issuing restricted (144) stock to Alpha, in the meantime the Company was sued by the plaintiff noteholders.

**Threats to Takeover or Destroy the Company**    *Hobbs Act threats, 18 USC 1951(a).*

45.    On at least three occasions, plaintiff noteholders have threatened me and my fellow corporate officers about taking over or destroying the Company.

46.    The first instance occurred in July 2001, when I and Clay Border traveled to New York City to meet with the representatives of Alpha Capital, Amro International, Stonestreet, and Hyperion to discuss the collapse of SES and the status of the Company's plans to rebuild.    In a highly derogatory manner, Thomas Badian stated to me as follows: "You little arrogant asshole. What makes you think that you can come up here and tell us what you are going to do.  I will destroy you and [the Company]."    *fugitive from federal indictment*

47.    The second instance occurred in or about August 2001.  Thomas Badian, the investment advisor to Amro International S.A., called my office to discuss the

CS CamScanner

Company's future plans for moving forward and resolving the problems that had been spawned by the SES fiasco and its impact on the SEC registration statement. Because of his loud and belligerent tone and slang, I placed the call on the speaker phone. Richard Twardowski, who is head of investor relations at the Company, overheard Badian's remarks. During that phone call, Thomas Badian threatened to destroy the Company and me along with it.

48.    The third instance occurred on or about February 12, 2002, after Grushko and I disagreed over the price for the escrowed shares, when Andrew Reckles called our securities counsel, Lawrence Mandala, to pass on the following threat: Reckles said that if the Company would not release the escrow shares with a value of 29 cents, all of the noteholders would combine to sue me personally, as the one who was responsible for not providing stock to which they believed they were entitled. see 02cv2219 (SDNY) lawsuit.

**Financial Condition of Group Management and Retirement of Plaintiffs' Notes**

49.    On or about April 2, 2002, the Company engaged The Shelley Group LLC, an investment banking firm in New York, to raise financing for new acquisitions of HR service firms. [See Attachment K.] To do so, the Shelley Group is attempting to raise $6 million -- $4 million for acquisition financing, $1 million to retire the plaintiff noteholders convertibles securities, and $1 million for general and administrative costs. Accordingly, this financing will completely retire the debt owed the plaintiff noteholders.

50.    On March 1, 2002, the Company, together with BestStaff, announced the formation of PeopleCorp, as the first step towards consolidating the business services industry. PeopleCorp has entered into a letter of intent to acquire a 45% stake in BestStaff, which recorded unaudited revenue of approximately $10 million in 2001.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 15, 2002

Elorian Landers





CLEARED DATE

FEB 2 6 2025

U.S. Marshals Service
Atlanta, GA 30303

Vania S. Allen
Office of the Bankruptcy Clerk
U.S. Bankruptcy Court (NDGA)
75 Ted Turner Dr., SW
Atlanta, GA 30303
Case No. 03-93031  Rule 8009(d)

The Office of Ulysses T. Ware
123 Linden Blvd., Ste 9-L
Brooklyn, NY 11226

Filed on 02.26.25

03-93031

Rule 8009(d)

(16-2) (Part 16-2)

[Contents]

F-7: Notice of Actual Adverse Consequences

F-8: Declaration of Baker & McKenzie, LLP
and Lawrence B. Mandala, Esq.

F-9: Declaration of Glorier Landers

/s/ Ulysses T. Ware and Group Management; Appellants